585 So.2d 1303 (1991)
Rayburn PEEK and Eve Peek
v.
RESERVE NATIONAL INSURANCE COMPANY and Lee Porter, Jr.
1900055.
Supreme Court of Alabama.
August 9, 1991.
*1304 Leila Hirayama of Johnson & Cory, Birmingham, for appellants.
Laura A. Woodruff of Maynard, Cooper, Frierson & Gale, Birmingham, for appellees.
PER CURIAM.
Rayburn and Eve Peek appeal from a summary judgment in favor of the defendants, Reserve National Insurance Company and Lee Porter, Jr., in their action alleging breach of contract, bad faith refusal to pay an insurance claim, and misrepresentation.
On September 3, 1985, Lee Porter, Jr., as an agent for Reserve National, met with Rayburn and Eve Peek, husband and wife, at the Peeks' home to discuss their desire to purchase a major medical health insurance policy that would provide coverage for themselves and their two minor daughters, Tina and Penny. The Peeks completed an application for coverage under Reserve National Insurance Company's group hospital-medical-surgical expense policy. As part of the application process, Porter questioned the Peeks regarding any hospital confinement or surgical operations that they had undergone. In response to these questions, the Peeks told Porter about menstrual difficulties and cramps that Tina had been experiencing since late 1984. They gave Porter a copy of the report written by Tina's physician, Dr. Snyder, following exploratory surgery that Dr. Snyder had performed on Tina in January 1985. The report including the following:
"The laparascope was then inserted through the sheath and the pelvis was visualized. Both ovaries were visualized and appeared normal. Both tubes were examined throughout their full extent and they too appeared normal. There were no adhesions present. The uterus was of normal size for this girl's age and without irregularities. There was no evidence of previous infection. There was no evidence of endometriosis or any other pelvic abnormality.... There was no evidence of injury to the bowel or to the bladder and there was no evidence of bleeding."
After the Peeks showed Dr. Snyder's report to Porter, Porter used the Peeks' telephone, read Dr. Snyder's report over the phone to someone, and questioned that person about coverage for Tina. Porter then told the Peeks that Tina would be "covered" under the policy that they were purchasing. Porter did not mention any preexisting condition exclusion to them or offer them a preexisting benefit endorsement. Porter summarized Dr. Snyder's report on the Peeks' application for the insurance with Reserve National, as follows:
"Lapiroscomy [sic] for exploration, but found no problems. Dr. Schwartz, Chattanooga, Tennessee. X-ray from local Dr. showed obstruction but specialist found no problemswas having regular *1305 periodprescribed birth control tablets about 5 months to regulate. (O.P. only)"
Also during this meeting on September 3, 1985, Eve Peek signed a document entitled "Outline of Group Hospital and Medical-Surgical Expense Coverage." That document contained the following provision regarding the waiting period for coverage for preexisting conditions:
"PREEXISTING CONDITIONS
"Pre-existing conditions disclosed on the application which are reflected on a PEB [pre-existing benefit] endorsement attached to your certificate, will be covered after 180 days. Other disclosed pre-existing conditions not specifically excluded from coverage or specific description are covered after two years from the issue date of the certificate."
The Peeks contend that they did not receive a copy of that "Outline" of coverage or see it again until discovery in this action. Mrs. Peek conceded that the signature on it might be hers, but stated by affidavit that she did not remember having seen it and that Porter did not read it to her at the time he took the application. The "Outline" of coverage expressly states that "This is not an insurance contract and only the actual certificate provisions will control."
Reserve National subsequently issued a policy to the Peeks, which was effective September 3, 1985. This policy was delivered to the Peeks by Porter. The policy contained the following pertinent provisions regarding covered sickness:
"SICKNESS DEFINED: The term `sickness' as used in this Certificate means sickness or disease sustained by an Insured Person, which first manifests itself after the effective date of this Certificate, and which causes loss while this Certificate is in force. The term `sickness' shall also be deemed to include all sickness or diseases suffered concurrently."
The policy also contained the following clause, entitled "Recurrent Injury or Sickness":
"If an Insured incurs no expense for an injury or sickness for a period of nine (9) consecutive months, any additional expenses incurred while this Certificate is in force for the same injury or sickness shall be considered as incurred for a new injury or sickness for the purpose of determining the limits of coverage."
The policy delivered to the Peeks did not contain any provision setting forth the definition of a "preexisting condition," nor did it contain any provision relating to the waiting periods for coverage for any expense that resulted from a preexisting condition.
In January 1986, Tina Peek consulted Dr. Blake Isbell, in Fort Payne, with complaints of pelvic pain. On January 12, 1986, Dr. Isbell admitted Tina to Baptist Medical Center in Fort Payne for exploratory surgery. The surgery revealed a left ovarian cyst, which Dr. Isbell removed. The Peeks submitted a claim to Reserve National for the costs of this operation. In considering the claim, Reserve National reviewed Dr. Isbell's summaries of the patient history and his physical examination, as well as the discharge report from Baptist Medical Center. The patient history included the following information:
"Miss Peek ... was referred to me by Dr. Elliott [her family physician] complaining of persistent left lower quadrant and pelvic pain for the past one year. She was noted to have a left ovarian cyst about 4 cms. in size documented X's 3 sonars over a period of one year."
The physical examination summary prepared by Dr. Isbell after his examination of Tina in January 1986 noted the following:
"IMPRESSION: 1. Persistent left ovarian cyst for the past one year causing pain and discomfort and limiting her from doing activities she would like to perform."
Additionally, the discharge summary, which was also prepared by Dr. Isbell, contained the following summary:
"Miss Peek is a 16 YOWF referred by Dr. Elliot for persistent left ovarian cyst. The cyst had been documented by 3 separate sonars and as mentioned had been present for the past one year giving her significant pain, discomfort and limiting *1306 her abilities to perform some of the things she would like to do in school."
Based upon this information from Dr. Isbell, Reserve National determined that Tina's ovarian cyst was a preexisting condition and, accordingly, denied the Peeks' claim for benefits. Following that denial, the Peeks filed this action for damages, alleging fraudulent misrepresentation, breach of contract, and bad faith refusal to pay a claim. The defendants, Lee Porter and Reserve National, filed a motion for summary judgment as to all claims asserted by the Peeks. That motion was granted by the trial court, and the Peeks now appeal the resulting summary judgment; they raise issues regarding all three of their claims.

Breach of Contract
Regarding the breach of contract claim, the Peeks first argue that the contract of insurance entered into between themselves and Reserve National did not contain an exclusion for preexisting conditions. As pointed out above, the policy of insurance purchased by the Peeks contained only two clauses pertaining to sickness: one clause that defined a "sickness," including the condition that a covered sickness must first manifest itself after the effective date of the policy, and a second clause that defined a "recurrent injury or sickness." The only explicit reference to preexisting conditions is the clause setting forth the waiting periods for coverage for preexisting conditions that is found in the document entitled "Outline" of coverage. The outline of coverage, however, specifically states:
"I. WHEN YOU RECEIVE YOUR CERTIFICATE, READ IT CAREFULLY! This outline of coverage provides a very brief description of some of the important features of the certificate. This is not an insurance contract and only the actual certificate provisions will control when and if the company issues the same."
The Peeks assert that they were not given a copy of the outline of coverage when they applied for coverage on September 3, that Porter did not read it to them, and that no copy of it was delivered to them with the insurance policy. Further, in order for the outline to merge with and become part of the insurance policy, it must be incorporated by reference into the insurance policy. Rochester v. Hamrick Const. Co., 481 So.2d 881 (Ala. 1985), overruled on other grounds, Elmore County Comm'n v. Ragona, 540 So.2d 720 (Ala.1989). The outline of coverage is not referenced in any way in the insurance policy received by the Peeks. Thus, the language in the outline of coverage purporting to define and limit coverage for preexisting conditions is not part of the contract and cannot serve as a basis for denial of the claim.
The Peeks next argue that Tina's left ovarian cyst did not manifest itself before the effective date of the contract, or that there was at least a fact question as to whether it so manifested, and that that fact precluded a summary judgment based on the definition of a covered sickness. To support this argument, the Peeks refer to the exploratory surgery performed by Dr. Snyder in January 1985, which revealed no abnormalities. Furthermore, the Peeks contend that Reserve National failed to meet its burden of proving that the insured's sickness originated prior to the effective date of the policy. Boston v. National Life & Accident Insurance Co., 405 So.2d 943 (Ala.Civ.App.), cert. denied, 405 So.2d 944 (Ala.1981) ("[i]n cases such as this the burden of proof is upon the insurer to establish that the insured's sickness originated prior to the effective date of the policy").
To sustain its burden of proving that Tina's sickness originated prior to the effective date of the policy, Reserve National points out that Tina's medical records prepared by Dr. Isbell stated that the cyst had been documented by sonar three times in the period of one year prior to January 1986. However, the evidence does not conclusively show that any of those three sonars that were allegedly performed were performed prior to the effective date of the policy. There is some evidence that a sonar was performed prior to the exploratory surgery in January 1985, *1307 but any positive results of that sonar were contradicted by that exploratory surgery. Thus, from the record before us, there is a fact question as to whether the cyst was the cause of Tina's earlier problems or whether it first manifested itself after the effective date of the policy.
Furthermore, there is evidence that Reserve National approved coverage for Tina with knowledge of the earlier symptoms and exploratory surgery, but did not except further treatment for that condition from coverage. With coverage for Tina in spite of those symptoms being an express part of the application for and approval of the contract of insurance, Reserve National may be held to have waived any claim that treatment for that condition was excluded from the coverage of the policy. Also, Reserve National paid for an ultrasound examination performed by Dr. Isbell several days before he performed the 1986 surgery, and the diagnosis from the ultrasound was "left ovarian cyst." "[T]he waiver of contract provisions may be implied from acts and circumstances surrounding the performance of the contract." Industrial Machinery, Inc. v. Creative Displays, Inc., 344 So.2d 743, 746 (Ala. 1977).
For the foregoing reasons, the trial court erred in entering the summary judgment as to the claim alleging breach of contract.

Fraudulent Misrepresentation
The elements of a claim alleging fraudulent misrepresentation have been set forth as follows:
"In order to support a claim of fraudulent misrepresentation, the following elements must be established: (1) a false representation; (2) concerning a material existing fact; (3) which is relied upon by the plaintiff; and, (4) damage to the plaintiff as a proximate result of the false representation."
Dickinson v. Moore, 468 So.2d 136, 137-38 (Ala.1985). Of these four elements, the parties dispute only the existence of a false representation by Porter and reliance on that representation by the Peeks. Therefore, we pretermit any discussion of the other elements.
The Peeks contend that, in applying for health insurance, they gave Lee Porter accurate information about Tina's medical history. It is undisputed that this information included the following report regarding Tina's medical history:
"Lapiroscomy [sic] for exploration, but found no problems. Dr. Schwartz, Chattanooga, Tennessee. X-ray from local Dr. showed obstruction but specialist found no problemswas having regular periodprescribed birth control tablets about 5 months to regulate. (O.P. only)"
The Peeks assert that, after they gave this information to Porter, he used their telephone to call someone, read Dr. Snyder's report over the telephone, questioned the party on the other end of the telephone line about coverage for Tina, and then represented to the Peeks that Tina would be "covered." The Peeks also state that Porter did not mention any preexisting condition exclusion to them or offer them a preexisting benefit endorsement.
The defendants contend that Mr. Porter did not make a false representation to the Peeks when he told them that Tina was "covered." According to the defendants, the trial court correctly granted their motion for summary judgment because Tina was "covered" under the policy of insurance; the coverage simply did not include coverage for further treatment for the described condition. Therefore, they contend, no misrepresentation occurred. We cannot agree.
The evidence is undisputed that, out of their concern about obtaining coverage for Tina, the Peeks specifically told Porter about Tina's prior medical problems and symptoms. In fact, the Peeks even provided Porter with Dr. Snyder's operative report from Tina's exploratory surgery in January 1985. Porter read this report to someone over the telephone and then represented to the Peeks that Tina was "covered." He did not explain any preexisting condition limitation to the Peeks or offer them a preexisting benefit endorsement. This evidence is sufficient to create a jury question as to whether Porter made a false *1308 representation concerning the coverage under the policy for Tina.
The defendants also contend that the evidence conclusively establishes that the Peeks did not rely upon any representation by Mr. Porter. They argue that the Peeks could not have relied on any statement made by Mr. Porter because they were informed of the limitation on pre-existing sicknesses by the outline of coverage, which was signed by Eve Peek.
In reversing a summary judgment on a claim alleging fraudulent misrepresentation, this Court in Hickox v. Stover, 551 So.2d 259, 263 (Ala.1989), held:
"This Court has recognized that if a plaintiff has been damaged by misrepresentations in the sale of the policy, then the later receipt of an insurance policy will not prevent those previous misrepresentations from being actionable. Southern Life & Health Ins. Co. v. Smith, 518 So.2d 77 (Ala. 1987).
"In light of modern society's recognition of a standard of business ethics that demands that factual statements be made carefully and honestly,
"`[r]eliance should be assessed by the following standard: A plaintiff, given the particular facts of his knowledge, understanding, and present ability to fully comprehend the nature of the subject transaction and its ramifications, has not justifiably relied on the defendant's representation if that representation is "one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth."'
"Southern States Ford, Inc. v. Proctor, 541 So.2d 1081, 1091-92 (Ala.1989) (Hornsby, C.J., concurring specially)."
Our review of the evidence does not support a holding that, as a matter of law, the representation by Mr. Porter was "so patently and obviously false that [the Peeks] must have closed [their] eyes to avoid the discovery of the truth." Hickox, supra.
Porter discussed with the Peeks Tina's earlier symptoms, and he relayed the medical report of her treatment to other agents of Reserve National. After receiving approval from those agents, he told the Peeks that Tina would be covered. A jury could find from these facts that Porter, on behalf of Reserve National, represented that Tina would be covered without any exclusion of further treatment related to the symptoms she had described. Given that Reserve National now asserts that the coverage did exclude such treatment, a jury could find that such a representation was false. Although the outline of coverage contradicted such a representation, a jury could find that Porter obtained Mrs. Peek's signature on that document but did not give a copy of it to the Peeks. Mrs. Peek stated in her affidavit that she did not remember seeing the outline of coverage on September 3, 1985, and that Porter did not read it to her or her husband. The contract itself does not so clearly contradict the representation as to preclude a finding of reliance.
Under these circumstances, a fact question was presented as to whether the Peeks could have justifiably relied upon a misrepresentation that coverage for Tina did not exclude further treatment relating to the disclosed symptoms. Thus, we reverse the trial court's summary judgment insofar as it related to the Peeks' claim of fraudulent misrepresentation.

Bad Faith
The elements of a bad faith cause of action are as follows:
"(a) an insurance contract between the parties and a breach thereof by the defendant;
"(b) an intentional refusal to pay the insured's claim;
"(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable or arguable reason); [and]
"(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason; [and]
"(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim." *1309 Nichols v. North Amer. Equitable Life Assur. Co., 502 So.2d 375, 377 (Ala.1987) (citations omitted).
In short, the plaintiff must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for disputing the claim. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim. Union Bankers Ins. Co. v. McMinn, 541 So.2d 494 (Ala.1989); Burkett v. Burkett, 542 So.2d 1215, 1217 (Ala.1989), quoting National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179, 183 (Ala.1982).
The documents before Reserve National at the time of the denial, principally the reports of Dr. Isbell referring to the existence of the cyst for more than one year, were sufficient to establish an arguable or debatable reason for denying the Peeks' claim. Thus, the trial court correctly entered the summary judgment in favor of the defendants as to the Peeks' bad faith claim.
Based on the foregoing, the judgment is affirmed as to the bad faith claim, but is reversed as to the contract and fraud claims, and the case is remanded for further proceedings consistent with this opinion.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
HORNSBY, C.J., and ADAMS, STEAGALL and INGRAM, JJ., concur.
ALMON, J., concurs specially.
ALMON, Justice (concurring specially).
I dissented in Hicks v. Globe Life & Acc. Ins. Co., 584 So.2d 458 (Ala.1991), based on my perception that the "justifiable reliance" standard adopted in Hickox v. Stover, 551 So.2d 259 (Ala.1989), had changed the law of fraud unnecessarily. I concur in the reversal of the summary judgment on the fraud claim in this case, however, because I think the material submitted in opposition to the summary judgment motion showed a question of fact under the "reasonable reliance" standard.