STEAGALL, Justice.
John Hyde appeals from a summary judgment for the defendants, Humana Insurance Company, Inc. (“HIC”), and Huma-na, Inc., in his lawsuit alleging breach of contract, bad faith failure to pay an insurance claim, and the tort of outrage.
Hyde, a licensed agent with HIC who sold renewals of Medicare policies, was insured under a group medical insurance policy offered by HIC. That contract became effective on May 1, 1988, and contained a “Major Transplant Benefit Rider,” which provided, in pertinent part:
“MAJOR TRANSPLANT means pretran-splant, transplant and post-discharge services, supplies, care and treatment received for or in connection with the medically necessary transplantation of the following human organs or tissue: heart, liver, kidney and bone marrow. “For a major transplant procedure to be considered approved to this Major Transplant Benefit, prior approval from our Medical Affairs Department in advance of the procedure is required. Such approval will be based on written criteria and procedures established by our Medical Affairs Department. If approval is given, the insured person will automatically be placed in the Medical Case Management Program, as described in this Group Policy. If approval is not given, benefits will not be provided for the procedure.”
(Emphasis added.) One of three exclusions to that rider reads: “No benefit is payable for or in connection with a major transplant if: ... 2. Our Medical Affairs Department does not approve coverage for the procedure, based on established criteria for medical necessity or based on a determination that the procedure is experimental for the condition involved.” (Emphasis added.)
On September 21, 1988, Hyde was hospitalized with severe hepatic cirrhosis; he was hospitalized two more times, in October and November 1988, with “near end stage cirrhosis.” By the fall of 1989, Hyde’s treating physician, Dr. Bart Mitchell, recommended that Hyde undergo a liver transplant. Hyde contacted HIC on December 29, 1989, and, in accordance with his insurance contract, requested pre-ap-proval for the transplant. In a letter dated January 8, 1990, Dr. Ronald S. Lankford, vice president of medical affairs with Hu-mana, Inc., wrote Dr. Mitchell and requested medical information regarding Hyde.[1]
*878 Hereinafter, “Humana” will collectively refer to HIC and Humana, Inc.
Hyde was hospitalized at Humana Hospital Shoals on January 16, 1990, for liver failure and an incarcerated inguinal hernia and was transferred the following day to the University of Alabama Hospital in Birmingham, where Dr. Steven Poplawski, director of the liver transplant unit, began the pretransplant evaluation process. On January 17, 1990, Dr. Lankford wrote Dr. Mitchell a letter containing, in pertinent part, the following:
“The request for coverage of a liver transplant for John Hyde has been reviewed by our Medical Affairs Department. Based on the information provided, the coverage of this procedure has been denied because Humana covers liver transplants only for biliary atresia and certain congenital metabolic disorders. “If the procedure is performed regardless of this denial, benefits will not be granted for any complications arising from such procedure.”
About two weeks later, Hyde wrote to the Humana Medical Affairs Department and asked that it reconsider the denial of coverage in his case. Dr. Lankford wrote Hyde the following letter on February 6, 1990:
“Thank you for your letter regarding the potential need for a liver transplant. As we stated in a letter to your physician on January 17, Humana provides liver transplant benefits only for biliary atresia and certain congenital metabolic disorders. “Humana’s Major Transplant Rider, to which you referred states:
“ ‘For a major transplant procedure to be considered approved to the Major Transplant Benefit, prior approval from our Medical Affairs Department in advance of the procedure is required. Such approval will be based on written criteria and procedures established by our Medical Affairs Department.’
“That written medical criteria [sic] has been applied to your case. We are sorry that this decision cannot be more favorable.”
(Emphasis added.)
Hyde initially decided to forgo the transplant upon learning that it would cost $150,000; however, on February 22, 1990, Hyde’s wife came home and found him unconscious. He was taken to Humana Hospital Shoals, where he remained until March 2, 1990. Upon Hyde’s returning *879 home, he decided to undergo the operation, which he had on March 28, 1990, at the University of Alabama Hospital in Birmingham.[2] Humana “administratively” approved coverage for the transplant on April 19, 1990. In his letter notifying one of Hyde’s doctors of Humana’s reconsideration, Dr. Lankford stated, “This decision does not alter our prior determination that Mr. Hyde does not contractually meet our liver transplant criteria.”
BREACH OF CONTRACT
The “written medical criteria” Dr. Lankford referred to are those stated in the “HUMANA HEALTH CARE DIVISION TRANSPLANT COVERAGE CRITERIA,” a two-page document specifically addressing six different transplant procedures. The third provision is entitled “LIVER TRANSPLANT,” and it reads:
“Benefits will be provided for only those cases arising from biliary atresia in any age and certain congenital metabolic disorders in members 17 years of age or less.
“If the candidate has one of these diagnoses and meets Humana’s criteria (Attachment B), the candidate will be approved for transplant benefits.”
Attachment B consists of 10 questions dealing with, for instance, whether the patient is “encephalopathic” or “septic.”
It is apparent from Dr. Lankford’s letters to Hyde and Dr. Mitchell that the above “medical criteria,” as they are referred to in the parties’ briefs, were the basis for Humana’s denial of coverage, not whether Hyde’s operation was medically necessary or experimental. Our query, therefore, becomes whether the incorporation by reference in Hyde’s policy of the medical criteria was valid.
Ala.Code 1975, § 27-14-13, entitled “Charter, bylaws, etc., of insurer as part of contract,” reads:
“No policy shall contain any provision purporting to make any portion of the charter, bylaws or other constituent document of the insurer, other than the subscriber s agreement or power of attorney of a reciprocal insurer, a part of the contract unless such portion is set forth in full in the policy. Any policy provision in violation of this section shall be invalid.”
(Emphasis added.) Statutes similar to § 27-14-13 have been interpreted as follows:
“A statute providing that an application, by-laws, and rules or parts thereof, unless attached to or printed on the policy, shall not be considered a part of the policy, is mandatory. While the parties may, subject to statutory restrictions, determine what terms shall be inserted in a life policy, a statute requiring endorsement or attachment defines the form they must use. The purpose of a statute requiring the whole insurance contract to be stated in the policy [is] the protection of the insured and of beneficiaries, not the relief of insurers, and must be construed broadly to ban every device by which terms of the contract may be altered or defeated by statements or agreements made orally or in another writing which the insured may have made without fully understanding their purpose or effect.
“Accordingly, any agreements not so attached to a policy are no part of the contract. Such a statute was enacted for the insured’s protection, and requires that every statement or representation on which the insurer desires to rely must be contained in a policy which complies with the statutory requirements. The insurer may not rely for a defense upon any matter which is not then contained in or attached to the policy.”
13A John Appleman and Jean Appleman, Insurance Law and Practice § 7521 (1976). See, also, Peek v. Reserve National Ins. Co., 585 So.2d 1303 (Ala.1991) (separate document entitled “Outline” of coverage not part of insurance policy, because not attached to it and not incorporated by reference into it).
We are unable to discern, from our review of the record, whether the document *880 containing the medical criteria Humana relied on to deny Hyde coverage was attached to Hyde’s policy when the parties executed the contract. Hyde testified as follows in his deposition:
“Q. When you were dealing with Huma-na Insurance people over the transplant trying to get coverage for your transplant, do you recall being told that you didn’t comply with the medical criteria referred to in the medical transplant rider?
“A. Yes.
“Q. Is that what you [were] consistently told by people at Humana Insurance? “A. Uh-huh. I also asked what the criteria was and nobody could tell me.
“Q. Did you not get letters that discussed what the criteria were?
“A. All they had said was [I] didn’t meet the written criteria.
“Q. Who did you ask at Humana Insurance for a definition of medical criteria?
“A. Sue Mattingly. I talked to her several times.
“Q. All right. Sue Mattingly. In none of the conversations you had with her—
“A. She didn’t know.
“Q. She didn’t know what the medical criteria .was?
“A. Or she wouldn’t tell me.
“Q. Did she say she didn’t know?
“A. She said it was hard to explain to people....
“Q. Have you ever gotten an explanation about it?
“A. Well, no, sir, not really. I read the policy. There was nothing in the policy about it. It ain’t explained in the policy or the contract. It didn’t explain it in there what it was. And like I said while ago, I’ve been in the business 24 years. I know a policy is a contract. But it’s supposed to do exactly what it’s supposed to do. If its an exclusion, it’s supposed to be an exclusion.
“Q. Your policy refers to medical criteria to be applied?
“A. It doesn’t explain what medical criteria is, though. It's not part of the policy.”
On the other hand, Dr. Poplawski stated the following in his deposition:
“Q. In this particular case, Mr. Hyde showed you the major transplant benefit rider from Humana Insurance Company, did he not?
“A. Yes, I remember him bringing the policy to show me.
“Q. And you reviewed the applicable provisions of that policy for liver transplants, did you not?
“A. Yes.
“Q. And did you advise him, sir, that in your opinion his transplant would not have been covered?
[[Image here]]
“A. Yes. By reading the specifics of the policy, it became evident that the policy was directed or made — supplied coverage to patients who had biliary atresia and congenital metabolic diseases and that his diagnosis could not be put in either one of those categories.”
We are also unable to say, as a matter of law, that the document styled “HUMANA HEALTH CARE DIVISION TRANSPLANT COVERAGE CRITERIA” was incorporated by reference into Hyde’s contract, because the reference in the transplant rider to “written criteria and procedures established by our Medical Affairs Department” is ambiguous. In Thomas v. Principal Financial Group, 566 So.2d 735 (Ala.1990), this Court held that the words “attending school on a full-time basis” were ambiguous, though not patently so, because they were clear and intelligible on their face and suggested but a single meaning and, further, that the trial court did not err in allowing the jury to determine whether the plaintiff’s decedent was, in fact, attending school on a full-time basis. Here, the rider does not specifically refer to the “HUMANA HEALTH CARE DIVISION TRANSPLANT COVERAGE CRITERIA” or even to the medical criteria contained in that document. It is impossible to tell from the rider exactly what “written criteria and procedures” would be used to deny or to provide coverage for a transplant.
*881 That question is, thus, one for a jury. In moving for a summary judgment, Humana had the burden of making a prima facie showing that there was no genuine issue of material fact and that it was entitled to a judgment as a matter of law. Rule 56, A.R.Civ.P.; Webb v. Henderson, 594 So.2d 103 (Ala.1992). Humana did not meet that burden; consequently, it was not entitled to a summary judgment on Hyde’s breach of contract claim.
BAD FAITH
The record contains ample evidence that Hyde’s operation was medically necessary and that, at the time the transplant was performed, it was no longer considered experimental by the medical community. There is also substantial evidence that Hu-mana did not consider either one of those factors when it denied Hyde’s claim; thus, there is a question of fact regarding whether Humana had a legitimate or debatable reason for denying the claim. Therefore, the summary judgment was also erroneous as to the bad faith count.
OUTRAGE
Finally, we conclude that Hyde did not present substantial evidence to rebut the defendants’ prima facie showing that there had been no legally actionable outrageous conduct. Therefore, we affirm the summary judgment as to the outrage claim.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and ALMON, ADAMS and INGRAM, JJ., concur.

. Although Hyde’s contract of insurance was with HIC, it appears from the record that Hu-mana, Inc., through Dr. Lankford, initially handled Hyde's claim. When questioned at his dep *878 osition in that regard, Dr. Lankford responded as follows:
"Q. By whom are you employed?
"A. Humana.
"Q. Humana what?
"A. Humana, Inc.
“Q. And what is your position with Humana, Inc.?
"A. Vice president of medical affairs in the Health Care Division.
[[Image here]]
"Q. What is your involvement with Humana Insurance Company?
“A. I am responsible, as the vice president of medical affairs, for a number of the areas in medical management. Presently those include transplant management.
[[Image here]]
"Q. Assuming that an individual has an insurance policy with Humana Insurance Company, Inc., that includes a major transplant benefit rider, and a question comes up concerning coverage under that policy for a specific transplant procedure and you are called in to look at that question and make decisions regarding coverage questions under that policy, on whose behalf are you making those decisions and determinations?
"A. I believe I make contract interpretations and medical necessity determinations on behalf of the corporation in which that individual is enrolled in.
"Q. So in my hypothetical I have just given you, that would be on behalf of Humana Insurance Company, Inc.?
"A. Correct.
"Q. Is it your testimony that when you make those decisions or those contract determinations, or whatever you are called on to do, that you are not doing that on behalf of Hu-mana, Incorporated?
"A. Correct.
“Q. What do you do on behalf of Humana, Incorporated?
"A. Nothing that I’m aware of. They employ me.
"Q. They employ you to perform these services for all these other corporations that actually issue the coverages. Is that correct?
"A. Correct. Correct.
"Q. Do you receive any of your compensation from Humana Insurance Company?
"A. No, Sir.”

. Hyde filed his complaint in this case on March 16, 1990.