ROBERTSON, Presiding Judge.
Laura Simmons appeals from a summary judgment of the Mobile County Circuit Court in favor of Congress Life Insurance Company (“Congress”) and Insurers Administrative Corporation (“IAC”) on her claims of bad faith refusal to pay or to investigate certain health insurance claims. She also appeals from a partial summary judgment in favor of Congress and IAC on her claim of breach of an insurance contract. Congress and IAC cross-appeal from the trial court’s denial of their “motion to reform” the pertinent insurance contract. We affirm.

Facts

This case arises from a dispute concerning the refusal to pay five claims submitted by Simmons immediately following her acquisition of health insurance coverage from Congress in May 1994. Because the principal issue in this case is whether the trial court properly granted the summary judgment in favor of Congress and IAC, we will review the facts in a light most favorable to Simmons, the nonmovant. Thompson v. Mindis Metals, Inc., 692 So.2d 805, 806 (Ala.1997).
From August 1992 until September 1993, Simmons received chiropractic treatment for symptoms of chronic back pain. This pain was later diagnosed as resulting from scoliosis (i.e., curvature of the spine).
On May 6, 1994, Simmons executed an application for group health insurance from Congress through an insurance agency in Mobile. That application contained several questions (accompanied by ‘Tes” *362 and “No” check boxes) designed to elicit certain facts from Congress applicants concerning their medical history, including one that asked whether any individual applying for coverage had, during the preceding five years, “[b]een diagnosed or treated for ... back disorder.” The “No” check box was marked next to this question on Simmons’s application.
Congress affords group health insurance coverage to two distinct constituencies. Some persons receiving group health insurance coverage from Congress are covered under a group insurance policy issued to the “Multiple Unit Security Trust I” (“MUST I”) under a plan called the “Insight” plan. This plan is designed to insure persons whose employers enroll them in group health insurance coverage and pay premiums to Congress to maintain that coverage. Other persons, whose employers do not secure health insurance from Congress, may nevertheless obtain group health insurance from Congress under a group insurance policy issued to the “Multiple Unit Security Trust II” (“MUST II”), under a plan called the “Insight Answer” plan, by paying the premiums for group coverage themselves.
The principal difference between coverage under the MUST I plan and coverage under the MUST II plan that is pertinent to this litigation concerns Congress’s exclusion of coverage for “pre-existing” medical conditions. Under the MUST I/Insight plan, “pre-existing condition” means “any ... sickness for which the individual received any medical care or treatment within the six (6) month period immediately prior to the effective date of the Major Medical Expense Benefits with respect to the individual” (emphasis added). However, under the MUST II/Insight Answer plan, “pre-existing condition” is defined as “any ... sickness, or any complications therefrom, for which medical treatment ... advice or consultation was rendered to the Insured, or which produced distinct symptoms in the Insured which would have caused an ordinarily prudent person to seek medical diagnosis or treatment within the twelve (12) months preceding the Insured’s effective date” (emphasis added). Thus, Congress’s group policy issued to MUST II more rigidly defined “pre-existing conditions” that would not trigger coverage.
Simmons’s employer did not participate in the MUST I plan, and her application (which was captioned “Insight Answer”) requested insurance “under the provisions of the Master Policy issued to the Multiple Unit Security Trust II by Congress.” However, upon agreeing to insure Simmons, Congress issued Simmons a certificate of insurance that stated that Simmons would be covered as of May 31, 1994, “if you are then at active, full-time work,” under a group policy issued to the “Policyholder”; the certificate named the “Multiple Unit Security Trust” (without a Roman numeral) as the “Policyholder.” This certificate contained a “pre-existing condition” definition consistent with Congress’s MUST I policy rather than the MUST II policy. The front of the certificate states that it “summarizes the provisions of the Policy as they may affect you,” and that it is “merely evidence of insurance under the Policy.”
On June 10, 1994, just after the effective date of her coverage, Simmons was seen by a physician in Mobile, and she received treatment over several weeks from a number of other medical providers. During this period, Simmons submitted five claims for payment for medical services rendered to Simmons, designated as claim numbers 996006, 995855, 995854, 995276, and 995519. * These claims contain “diagnosis codes” identifying the condition prompting the services and treatments Simmons re *363 ceived as having been “lumbago/lower back pain,” “backache, unspecified,” “pain in neck/cervicalgia,” “migraine, unspecified,” “congenital musculoskeletal deformity of spine (posturaldordosis scoliosis),” and “disturbance of skin sensation.”
Among the medical records submitted in support of these claims were the June 22, 1994, office notes of Dr. Richard Sawyer, who noted:
“[Simmons] ... is referred for a variety of aches and pains of at least several months duration. [She] reports a constellation of symptoms which probably began about 6 mo. ago. One day at work 6 mo. ago, she noted sudden onset of vertigo and her left arm felt numb and weak. Many of these symptoms resolved over that day but over the next 2 weeks she continued to feel off balance. This all subsequently improved. Over the next few months she began to develop a pinching sensation in her neck and lately she has noted that whenever she moves her neck the bottom half of her low back, feet and legs go to sleep. Her feet and legs feel numb much of the time and she notices that below her knees she can’t feel it when she shaves. Has also had severe pain in her left low back which runs down her leg and this started a month ago. Has noted numbness and tingling in her fingertips which comes and goes. The numbness and tingling in her legs below her knees has been present about a month. She denies any previous or recent viral illnesses, injuries, or immunizations. She saw a chiropractor during this time and he diagnosed mild [scoliosis] and left sciatica. Manipulations did not help and she reports that her neck symptoms seemed to get worse after [he] did some manipulations there.”
(Emphasis added.) On June 30, 1994, after a follow-up visit from Simmons, Dr. Sawyer would note his impression of her condition as “Possible] MS” (multiple sclerosis), extremity paresthesias, and left hip and leg pain. Simmons continued to undergo diagnostic and treatment procedures from Dr. Sawyer and other professionals during the following three months.
IAC, which is the third-party administrator that administers claims submitted to Congress under the policy issued to MUST II, received and reviewed Simmons’s five claims, as well as Dr. Sawyer’s office notes. An IAC benefits analyst recommended that Simmons’s claims be denied, stating as follows:
“Long [history] of numerous neuro-mus-cular [conditions]. ‘Could not remember’ name of chiro who treated in past. Pis. deny all claims as pre-ex. (prudent person). Pis. change [diagnosis] of Cl. # 995854 to 723.1 [i.e., pain in neck/cer-vicalgia].”
On September 21, 1994, IAC informed Simmons that her claims would be denied as pre-existing conditions.
After discovering that IAC had denied her claims, Simmons telephoned another IAC employee, who informed her that the claims were denied based upon the existence of a pre-existing condition. The IAC employee told her that she had “the right to appeal” if she did not agree with the way the claims had been processed, and stated that she needed to have supporting documentation (generally from a physician) concerning why the condition would not have been pre-existing. Simmons submitted a handwritten letter in December 1994 requesting reconsideration of her claims, along with a letter from Dr. Sawyer stating that he felt that Simmons had multiple sclerosis and that her MS “has nothing to do with the previous scoliosis and sciatica diagnosed by the chiropractor who had seen her in the past.” However, IAC closed her appeal file because it was *364 unable to obtain a full set of chiropractic records concerning her previous conditions.

Procedural History

On October 31, 1995, Simmons filed a complaint in the trial court naming Congress, IAC, and Affordable Insurance Agency, Inc.,[1] as defendants. Simmons claimed that the denial of her five claims constituted a breach of the Congress insurance contract so as to warrant the assessment of compensatory damages, and that IAC and Congress’s conduct constituted a tortious bad faith refusal to pay or to investigate a valid insurance claim so as to warrant an award of compensatory and punitive damages. Congress and IAC filed an answer to the complaint, and the trial court entered an order setting a trial date in the case. Simmons filed a motion to continue the trial, which was granted by the trial court; the trial court also ordered that “[n]o amendments to the complaint shall be filed without leave of court.”
Simmons filed a motion for a partial summary judgment on her breach of contract claim, in which she requested that the trial court declare IAC and Congress’s liability but reserve the issue of damages on the contract claim for determination by a jury. IAC and Congress filed a motion for a summary judgment on both of Simmons’s claims, and filed a “motion for reformation of contract” seeking reformation of the insurance contract between Congress and Simmons to include the preexisting condition definition contained in the MUST II policy rather than that applicable to the MUST I policy that appeared in the certificate of coverage that was originally sent to Simmons. The trial court denied Simmons’s motion for a partial summary judgment on January 9, 1997, concluding that “the issue before the Court is not ripe for determination.”
On January 15, 1997, Simmons filed a motion for leave to amend her complaint so as to assert the existence of 51 purportedly denied insurance claims by Congress and to assert that these claim denials and Congress’s premium increases had caused her to allow her policy to lapse in May 1996. However, the trial court did not rule upon this motion.
Upon consideration of Congress and IAC’s motion for a summary judgment, the trial court entered an order on January 27, 1997, granting the motion as to Simmons’s bad faith claim, but denying the motion as to her breach of contract claim. In its order, the trial court also denied anew Simmons’s motion for a partial summary judgment as to the breach of contract claim, and denied Congress and IAC’s “motion for reformation of contract.”
With a trial date approaching, Congress and IAC then filed a motion in limine or, in the alternative, a motion for a partial summary judgment concerning Simmons’s right to recover extracontractual damages, other than possible mental anguish damages, on her breach of contract claim. In this motion, Congress and IAC asserted that at trial Simmons would seek the entire future value of her medical benefits under the Congress policy, but that because Simmons had allowed her policy to lapse on May 30, 1996, her claims for such benefits were barred as a matter of law. In addition to this motion, IAC filed a separate motion requesting that it be dismissed from Simmons’s contract claim, or that a summary judgment be entered in its favor on that claim, because, it said, it was not a party to the Congress insurance *365 policy. Simmons subsequently filed objections to both of these motions, and the parties supplied evidentiary and legal materials supporting their positions.
In two separate orders dated October 16, 1997, and November 21, 1997, the trial court granted the motions for a partial summary judgment as to extracontractual damages and for dismissal of, or a summary judgment in favor of, IAC. Thereafter, on February 7, 1998, the trial court directed the entry of a final judgment, pursuant to Rule 54(b), Ala.R.Civ.P., as to its orders of January 9, 1997; January 27, 1997; October 16,1997; and November 21, 1997, noting that these orders had “eviscerated[d] 80% of Simmons’s claims against Congress and IAC” and that an immediate appeal would obviate the need for a second trial.
Simmons appealed the judgment to the Alabama Supreme Court, and Congress and IAC cross-appealed the denial of their “motion for reformation of contract.” The Alabama Supreme Court transferred the appeals to this court, pursuant to § 12-2-7(6), Ala.Code 1975.

I. The appeal

A. IAC’s Liability

It is undisputed that IAC did not issue the policy of insurance made the center of controversy in this case, but acted as a third-party administrator for Congress in processing claims under the MUST I and MUST II group policies. Conversely, there is no evidence tending to indicate that IAC entered into an insurance contract with Simmons.
As our Supreme Court held in Ligon v. O.M. Hughes Ins., Inc., 551 So.2d 283 (AIa.1989), “[t]he tort of ‘bad faith’ is not a cognizable cause of action in Alabama, except in the context of a breach of an insurance contract ... by a party to that insurance contract.” 551 So.2d at 285 (emphasis added). Where there is no evidence, as here, that a plaintiff in a bad faith action had an insurance contract with a defendant in the action, a summary judgment in favor of that defendant is proper. See id. The trial court therefore properly entered the summary judgment in favor of IAC on Simmons’s bad faith claim.
Ligón also supports the proposition that a party to an insurance contract may not sue a nonparty for breach of that contract. The plaintiff in Ligón brought a breach of contract action against not only his insurer, but also an independent adjuster and its agent. The Alabama Supreme Court affirmed a summary judgment in favor of the adjuster and the adjuster’s agent on that claim, noting that the undisputed evidence in that case revealed that they were not parties to the plaintiffs insurance contract. 551 So.2d at 285.
Simmons nevertheless urges this court to reverse the summary judgment in favor of IAC on the breach of contract claim, alleging that IAC is liable to her under a theory of “quasi-contract” because it was, she contends, a “de facto” party to the Congress policy. The record reveals, however, that this theory of liability was never pleaded in the trial court and that Simmons did not rely upon a “quasi-contract” in responding to IAC’s motion seeking a judgment in its favor on the contract claim, but sought only to hold IAC liable under the terms of her group insurance. “It is a fundamental rule of appellate procedure that, regardless of the merits of the appellant’s contentions, appellate courts will not review questions not decided by the trial court.” Etherton v. City of Homewood, 700 So.2d 1374, 1377-78 (Ala.1997); see also Humber v. B.F. Goodrich Co., 561 So.2d 511, 514 (Ala.1990) (plaintiff who did not seek relief under quasi-contract theory in trial court could not raise issues under that theory for first time on appeal). *366 Thus, we conclude that the summary judgment in favor of IAC on both of Simmons’s claims is due to be affirmed. We therefore proceed to determine the remaining issues bearing upon Congress’s liability, if any, to Simmons.

B. Simmons’s Summary Judgment Motion

As we have noted, Simmons filed a motion for a partial summary judgment on her breach of contract claim, requesting the trial court to conclude that Congress was liable to her, while reserving the issue of damages for later determination by a jury. The trial court denied this motion on January 9, 1997, concluding that “the issue before the Court is not ripe for determination,” and again denied the motion on January 27, 1997, concluding that there was “considerable dispute” about material facts. The trial court later purported to certify these orders as final. On appeal, Simmons asserts that the denial of her motion for a partial summary judgment was erroneous, and attempts to invoke this court’s review of that decision.
However, we note that an order denying a summary judgment is “interlocutory in nature, not made appealable by statute, and will, therefore, not support an appeal.” Whitehead v. Baranco Color Labs, Inc., 353 So.2d 793, 794 (Ala.1977). Moreover, “ ‘the denial of a summary judgment is inherently nonfinal and a certificate following the precise language of Rule 54(b)[, Ala.R.Civ.P.,] cannot serve to make it final and thus appealable.’ ” Farley v. Genuine Parts Co., 701 So.2d 43 (Ala.Civ.App.1997) (quoting Ex parte State Farm General Ins. Co., 549 So.2d 484, 486 n. 2 (Ala.1989)). Any consideration of whether the denial of Simmons’s motion for a partial summary judgment was correct or incorrect must therefore be pretermitted. Parsons Steel, Inc. v. Beasley, 522 So.2d 253, 257 (Ala.1988).

C. Congress’s Bad Faith Liability

We next consider whether the trial court properly entered the summary judgment in favor of Congress on Simmons’s bad faith claim.
Rule 56, Ala.R.Civ.P., sets forth a two-tiered standard for determining whether to enter a summary judgment. In order to enter a summary judgment, the trial court must determine: 1) that there is no genuine issue of material fact and 2) that the moving party is entitled to a judgment as a matter of law. In determining whether a summary judgment was properly entered, the reviewing court must view the evidence in a light most favorable to the nonmovant. Long v. Jefferson County, 623 So.2d 1130, 1132 (Ala.1993). We note that Rule 56 is to be read in conjunction with the “substantial evidence rule” (§ 12-21-12, Ala.Code 1975). West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). In order to defeat a defendant’s properly supported motion for summary judgment, the plaintiff must present “substantial evidence,” i.e., “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” Id.
The elements of a tort claim based upon an insurer’s alleged bad faith refusal to pay benefits due under a valid contract of insurance are well settled:
“ ‘The plaintiff in a “bad faith refusal” case has the burden of proving:
“ ‘(a) an insurance contract between the parties and a breach thereof by the defendant;
“ ‘(b) an intentional refusal to pay the insured’s claim;
“ ‘(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
*367 ‘“(d) the insurer’s actual knowledge of the absence of any legitimate or arguable reason;
“ ‘(e) if intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer’s intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.
“ ‘In short, plaintiff must go beyond a mere showing of nonpayment and prove a bad faith nonpayment without any reasonable ground for dispute. Or, stated differently the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim.’ ”
Garrett v. Auto-Owners Ins. Co., 689 So.2d 179, 182 (Ala.Civ.App.1997) (quoting National Sec. Fire & Cas. Co. v. Bowen, 417 So.2d 179, 183 (Ala.1982) (emphasis removed)). “Proof of mere negligence or mistake is not sufficient to support a claim of bad faith; there must be a conscious intent to injure.” Harrington v. Guaranty Nat’l Ins. Co., 628 So.2d 323, 326 (Ala.1993). Moreover, “ ‘[wjhether an insurance company is justified in denying a claim under a policy must be judged by what was before it at the time the decision was made.’ ” Gonzalez v. Blue Cross/Blue Shield of Alabama, 689 So.2d 812, 818 (Ala.1997) (emphasis added; quoting National Sav. Life Ins. Co. v. Dutton, 419 So.2d 1357, 1362 (Ala.1982)).
In this case, the “decision was made” to deny coverage for claims 996006, 995855, 995854, 995276, and 995519 on September 21, 1994, when IAC first informed Simmons that her claims would be denied on the basis that the treatments referenced were for pre-existing conditions. Neither the information IAC received after that denial, nor its closure of its file concerning Simmons’s internal appeal from the denial, has any bearing upon whether the original denial was proper. If the tort of bad faith was committed, it was committed at the time of the original denial and no later. See Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1053 (Ala.1987) (“Once the bad faith has occurred, once the duty to use good faith in considering insurance claims has been breached, the insurance company cannot later seek to justify its denial by gathering information which it should have had in the first place.”).
At the time that Simmons’s five claims were denied, the information before IAC, the third-party claims administrator, included the claim forms filed by Simmons’s medical providers, none of which disclosed multiple sclerosis as a diagnosis code for which treatment was rendered. Also in IAC’s possession were Dr. Sawyer’s June 22, 1994, office notes, which related that Simmons had experienced a “variety of aches and pains of at least several months[’] duration,” that her symptoms probably had begun about six months before her first visit to Dr. Sawyer, and that she had seen a chiropractor “during this time”[2] who had diagnosed, and treated her for, mild scoliosis and left sciatica.
We have noted that Congress’s MUST II policy more broadly defines the term “pre-existing condition” than the MUST I policy by (1) expanding the pertinent time period before coverage to 12 months from six months, and (2) incorporating a “prudent person” standard to exclude conditions that could reasonably be said to have existed during that period but that were not treated. However, Dr. Sawyer’s refer- *368 enees to Simmons’s having visited a chiropractor for treatment of scoliosis over the preceding six months before his seeing her on June 22, 1994, would have indicated that Simmons had seen a chiropractor for scoliosis and sciatica during the six-month period preceding her coverage date of May 31,1994.
We further note that our Supreme Court has broadly defined the concept of a “debatable reason” for denying coverage. As stated in Bowen, supra, a “debatable reason” “means an arguable reason, one that is open to dispute or question,” and “[w]hen a claim is ‘fairly debatable,’ the insurer is entitled to debate it, whether the debate concerns a matter of fact or law.” 417 So.2d at 183. We conclude that even under the MUST I pre-existing condition exclusion, coverage for claims 996006, 995855, 995854, 995276, and 995519, which contain the diagnosis codes “lumbago/lower back pain,” “backache, unspecified,” “pain in neck/cervicalgia,” “migraine, unspecified,” “congenital musculoskeletal deformity of [the] spine,” and “disturbance of skin sensation,” was fairly debatable in light of Dr. Sawyer’s office notes.
Further, the fact that Simmons had applied for coverage under MUST II and IAC viewed her as being insured under MUST II bears upon the issue of whether Congress acted with intent to injure. Our Supreme Court has indicated that an insurer’s issuance of a certificate of insurance containing terms that differ from the terms of a master policy does not destroy an insurer’s right to rely upon the master policy, at least for purposes of determining “debatability” of a claim under Bowen. In Peek v. Reserve Nat’l Ins. Co., 585 So.2d 1303 (Ala.1991), an insurer denied a claim under a medical insurance policy for benefits related to treatment for an ovarian cyst on the basis that the insured’s condition was “pre-existing”; however, the exclusion of pre-existing conditions from coverage relied upon by the insurer was not contained in the certificate issued to the insured, but only in a coverage “outline” retained by the insurance company. Despite this omission, the Peek court affirmed a summary judgment in favor of the insurer on the insured’s bad faith claim, concluding that a doctor’s reports indicating that the ovarian cyst had existed for over a year before the effective date of coverage constituted an “arguable or debatable reason” for denying the insurance claim, notwithstanding the insurer’s failure to deliver an insurance certificate containing the exclusion. 585 So.2d at 1309. See also Ex parte Finkbohner, 682 So.2d 409, 414 (Ala.1996), in which the Alabama Supreme Court, in commenting on whether a bad faith claim could be maintained against an insurer based upon its reliance upon a policy provision not disclosed to the insured, as opposed to a certificate of insurance issued to the insured, stated that “[i]n the absence of fraud, the existence of an otherwise valid coverage exclusion in a policy would arguably provide the insurer with a legitimate or debatable reason for denying a claim.”
Because the existence of a debatable reason for denying coverage is to be tested based upon the materials before the insurer at the time the claim is denied, and no later, and because the materials submitted to IAC before Simmons’s claim was denied on September 21, 1994, indicated the existence of such a debatable reason, we conclude that the trial court properly entered the summary judgment in favor of Congress on Simmons’s bad faith claim.[3] *369 That portion of the trial court’s judgment is due to be affirmed.

D. Summary Judgment on “Future Damages”

Simmons also appeals from the trial court’s partial summary judgment in favor of Congress concerning her entitlement to “future damages” on her breach of contract claim.
As noted above, Simmons’s complaint sought the recovery of compensatory damages allegedly resulting from the denial of five claims filed within the first few months of her group health insurance coverage. However, in Simmons’s proposed amended complaint (which has yet to be allowed by the trial court), she contended that Congress had increased her monthly premiums by over 100% between her initial coverage in May 1994 and May 1996, and that various other claims she had submitted during that period had been denied; she further alleged that these “wrongful actions” had rendered her coverage “worthless” and had caused her to discontinue premium payments so as to result in the lapsing of her coverage. Congress’s motion for a partial summary judgment sought to limit Simmons’s recovery on her breach of contract claim to “the amount of any claims which should have been paid under the contract, plus any claims of mental anguish which were proximately caused” by the breach; it specifically opposed Simmons’s right to recover “the future value of her medical benefits if she had kept her health insurance in force ” (emphasis in original). Thus, the goal of Congress’s motion (and the effect of the trial court’s order granting the motion) was to bar Simmons’s recovery of “all future medical benefits she would have received under the policy, up to the $2 million lifetime maximum,” as “consequential damages” she contends resulted from the failure to pay her insurance claims.
The trial court, in its eight-page order granting Congress’s motion, concluded that Simmons could not allow her group health insurance coverage to lapse and simultaneously claim all of the benefits she conceivably would have received under that coverage.
While Simmons contends that she had “no duty to mitigate” her damages, she ignores the essential nature of health insurance, which is to provide reimbursement for covered medical expenses incurred during the policy period. Here, Congress’s contractual duty to provide coverage for Simmons’s medical expenses ceased, as a matter of law, when Simmons failed to comply with her obligations to pay the premium, i.e., the consideration for that coverage.[4] Alabama law does not require a health insurer to continue to pay an insured’s expenses after its coverage has terminated. See Monninger v. Group Ins. Serv. Ctr., Inc., 494 So.2d 41, 43 (Ala. *370 1986) (group health insurer not required to pay for hospitalization of former insured, even though injury prompting hospitalization occurred before termination of coverage). As an Alabama federal court determined, “ ‘when a policy insures against the “incurrence of expenses,” the benefits cease when the policy is terminated and the insurer is not responsible for expenses arising after the termination.’ ” Gardner v. Union Nat’l Life Ins. Co., 780 F.Supp. 792, 794 (M.D.Ala.1991) (citing Monninger and quoting Mote v. State Farm Mut. Auto. Ins. Co., 550 N.E.2d 1354, 1357 (Ind.Ct.App.1990)).
The trial court correctly concluded that Simmons’s coverage terminated as a result of her nonpayment of premiums, and that Congress was not liable for “future medical benefits” with respect to Simmons’s medical expenses after the termination of that coverage. Her continued payment of premiums, rather than being a mere matter of “mitigation of damages,” was a condition precedent to her right to receive coverage from Congress for her future medical expenses.[5] Monninger, supra, 494 So.2d at 43. Therefore, the trial court’s partial summary judgment as to this issue is due to be affirmed.

II. The Cross-Appeal

Congress and IAC have cross-appealed from the denial of their “motion for reformation” of Simmons’s insurance contract. Because we have already concluded that the summary judgment in favor of IAC on both of Simmons’s claims was correctly entered, IAC’s cross-appeal is moot. E.g., Parmater v. Amcord, Inc., 699 So.2d 1238, 1241 (Ala.1997) (cross-appeal from denial of defendant’s motion to dismiss mooted by affirmance of summary judgment in favor of defendant). However, because portions of Simmons’s breach of contract claim against Congress remain to be adjudicated by the trial court, the cross-appeal is not moot as to Congress.
Simmons contends that the motion for reformation was properly denied because it was not raised in a pleading as a counterclaim. However, under Simpson v. First Alabama Bank of Montgomery, N.A., 345 So.2d 292 (Ala.1977), the Alabama Supreme Court construed a “petition for reformation” filed by an intervenor in a multi-claim action as a claim for relief that could be made the subject of a direction of a “final judgment” under Rule 54(b). Although the Simpson court dismissed the appeal from the denial of such a petition as not having been taken from a final judgment because the trial court had not entered a Rule 54(b) order, it indicated that it would have had jurisdiction to review the denial upon entry of a final judgment or entry of an order in conformity with Rule 54(b). 342 So.2d at 293. We thus conclude that Congress’s “motion to reform,” although perhaps unusual, was a proper means of invoking an order from the trial court that, if issued, would have reformed Simmons’s insurance policy.
Section 8-1-2, Ala.Code 1975, upon which Congress relies, allows the reformation of a written contract when, “through fraud, a mutual mistake of the parties, or a mistake of one party which the other at the time knew or suspected,” the instrument “does not truly express the intention of the parties.” However, § 8-1-2 has no application to the unilateral mistakes of contracting parties. See American & Foreign Ins. Co. v. Tee Jays Mfg. Co., 699 So.2d 1226, 1229 (Ala.1997). In Tee Jays, the insurance company issued an commer- *371 dal insurance policy to a business that included provisions covering business income loss, i.e., lost profits or earnings after a covered occurrence. Later, the insured submitted a claim under that coverage that was never paid by the insurer, and the insured filed a breach of contract action; in that action, the insurer claimed that the inclusion of the business income loss provisions was a mistake, that the insured’s failure to pay a premium for such coverage indicated that it had not intended to have such coverage, and that it was entitled to reformation of the policy. The Alabama Supreme Court affirmed the trial court’s denial of reformation on the basis that the inclusion of the improper coverage form was a unilateral mistake that was not remediable under § 8-1-2.
In this case, IAC, Congress’s third-party administrator, sent Simmons a certificate of insurance form that corresponded to the provisions of the MUST I policy rather than the MUST II policy. The certificate sent to Simmons, which identifies the “Policyholder” as the “Multiple Unit Security Trust” (without an identifying Roman numeral), contained a six-month pre-existing condition exclusion, while the “proper” certificate would presumably have contained a pre-existing condition exclusion in conformity with the MUST II policy’s 12-month “prudent person” provision. However, while Congress has characterized IAC’s provision of such a certificate to Simmons as having been a “mistake,” Congress has not presented any evidence that Simmons made this “mistake,” that she misrepresented which policy she was applying for, or that she knew or suspected that she had been issued the “wrong” certificate of insurance. Simmons’s apparent failure to interpret certain language in IAC’s certificate of insurance (which was over 30 pages long) as a “mistake” at the time she received it is not the legal equivalent of knowledge or a suspicion that IAC had issued her an incorrect certificate, and Congress is not entitled to reformation based upon the unilateral mistake of its agent, IAC, alone. Tee Jays, supra. Accordingly, the trial court’s denial of reformation is due to be affirmed.

III. Conclusion

Based upon the foregoing facts and authorities, the judgments of the trial court made the subject of Simmons’s appeal and IAC and Congress’s cross-appeal are due to be affirmed.
APPEAL — AFFIRMED.
CROSS-APPEAL — AFFIRMED.
YATES, MONROE, CRAWLEY, and THOMPSON, JJ., concur.

. Affordable Insurance Agency, Inc., has not answered the complaint, and is not a party to this appeal.

. Dr. Sawyer later testified at his second deposition that the time period he was referencing was "[s]ometime ... in at least the six months before seeing me,” and that Simmons had told him that the symptoms seemed to start within the previous six months.

. Although Simmons contends on appeal that Congress may also be liable for its alleged "intentional failure to determine whether or not there was any lawful basis” for denying *369 coverage, we note that our conclusion that Congress established a debatable reason for the denial of coverage that existed at the time of the denial also disposes of this alternative allegation. " 'Alabama law is clear that regardless of the imperfections of [an insurer's] investigation, the existence of a debatable reason for denying the claim at the time the claim was denied defeats a bad faith failure to pay the claim.’ ” Weaver v. Allstate Ins. Co., 574 So.2d 771, 775 (Ala.1990) (emphasis removed; quoting State Farm Fire & Cas. Co. v. Balmer, 891 F.2d 874, 877 (11th Cir.), cert. denied, 498 U.S. 902, 111 S.Ct. 263, 112 L.Ed.2d 220 (1990)).

. The certificate of insurance issued to Simmons conditions Congress’s duty to pay upon "the Insured Individual or one of their [sic ] eligible dependents ... incur[ring] ... Covered Medical Expenses which exceed the applicable Deductible Amount,” although only "while insurance for Major Medical Expense Benefits is in force with respect to such individual.”

. We note that the record reveals that IAC retroactively reinstated insurance coverage for Simmons under the MUST II policy, but that Philadelphia Life Insurance Company has assumed Congress’s position under that policy as of June 1, 1996.