LYONS, Justice.
The plaintiff Laura A. Simmons appealed to this Court from summary judgments in favor of Congress Life Insurance Company (“Congress”) and Insurers Administrative Corporation (“IAC”) on her claims alleging bad-faith refusal to pay, or to investigate, certain health-insurance claims. She also appealed from a partial summary judgment in favor of Congress and IAC on her claim alleging breach of the insurance contract. Congress and IAC cross-appealed from the trial court’s denial of their motion to “reform” the insurance contract. We transferred the appeals to the Court of Civil Appeals, pursuant to § 12-2-7(6), Ala.Code 1975. The Court of Civil Appeals affirmed the judg *373 ments of the trial court; see Simmons v. Congress Life Ins. Co., 791 So.2d 360 (Ala.Civ.App.1998). We granted Simmons’s petition for certiorari review.[1] We affirm the judgment of the Court of Civil Appeals in part, reverse it in part, vacate it in part, and remand.
I. Factual Background
On May 6, 1994, Simmons applied for group health-insurance coverage with Congress. The application for insurance with Congress asked several questions about the applicant’s medical history during the preceding five years. One question specifically asked whether the applicant had “[b]een diagnosed or treated for ... back disorder.” Simmons checked the “no” box next to this question. From August 1992 until September 1993, however, Simmons had been treated by a chiropractor for chronic back pain.[2] She later was diagnosed as having scoliosis (curvature of the spine), which was thought to be the source of her pain.
Congress offers coverage for two different groups under two different insurance plans. The “Insight plan” is designed to insure individuals whose employers procure group health insurance for them and pay premiums to Congress for their employees’ health insurance. Persons insured under the Insight plan are covered under a policy issued to the Multiple Unit Security Trust I (“MUST I”). The “Insight Answer plan” is designed to insure individuals whose employers do not procure group health insurance for them and who pay premiums themselves to Congress for their health insurance. Persons insured under the Insight Answer plan are covered under a policy issued to the Multiple Unit Security Trust II (“MUST II”). The two policies define “pre-existing medical condition” differently. Under the MUST I policy, “pre-existing condition” is defined as “any ... sickness for which the individual received any medical care or treatment within the six (6) month period immediately prior to the effective date of the Major Medical Expense Benefits with respect to the individual.” Under the MUST II policy, “pre-existing condition” is far more broadly defined as “any ... sickness, or any complications therefrom, for which medical treatment, ... advice or consultation was rendered to the Insured, or which produced distinct symptoms in the Insured which would have caused an ordinary prudent person to seek medical diagnosis or treatment within the twelve (12) months preceding the Insured’s effective date.”
Because her employer did not provide health insurance, Simmons applied to Congress for coverage under the MUST II policy. Congress issued Simmons a certificate of insurance with an effective date of May 31, 1994, “if [the insured was] then at active, full-time work,” under a group policy issued to the “Multiple Unit Security Trust [no Roman numeral]” as the policyholder. The certificate sent to Simmons contained the definition of “pre-existing condition” found in MUST I policies. The front of the certificate stated that the certificate itself “summarizes the provisions of the Policy as they may affect you” and that the certificate is “merely evidence of insurance under the Policy.”
Shortly after the effective date of her coverage, Simmons’s primary-care physician referred her to Dr. Richard Sawyer, a neurologist, for consultation in identifying the cause of medical problems Sim *374 mons was then experiencing. Dr. Sawyer’s notes reflect that Simmons reported that she was experiencing pain and numbness in various parts of her body. Dr. Sawyer ordered a battery of tests and recommended to Simmons that she also consult an orthopedic surgeon. Simmons’s medical providers submitted five claims to Congress for payment of medical services rendered to her during this period, designated as claims 996006, 995865, 995854, 995276, and 995519. These claims contained diagnostic codes that identified the condition giving rise to the medical services as “lumbago/pain low back,” “backache, unspecified,” “pain in joint,” “migraine, unspecified,” “pain in neck/cervicalgia,” “congenital musculoskel-etal deformity of spine (postural: lordosis scoliosis),” and “disturbance of skin sensation.” Dr. Sawyer’s office notes concerning his treatment of Simmons were also submitted with the claims. In these notes, Dr. Sawyer stated on June 22, 1994, that Simmons had been “referred for a variety of aches and pains of at least several months[’] duration. [She] reports a constellation of symptoms which probably began about 6 mo. ago.... She saw a chiropractor during this time and he diagnosed mild scoliosis and left sciatica.” (See the opinion of the Court of Civil Appeals for the text of Dr. Sawyer’s notes, 791 So.2d at 863). On June 30, Dr. Sawyer’s notes reflected that he thought Simmons’s problems might be caused by multiple sclerosis. Simmons continued to undergo diagnostic testing and treatment by Dr. Sawyer and other medical-service providers during the next three months.
IAC is the third-party that administers claims submitted to Congress under the MUST policies. Upon receiving Simmons’s first five claims and Dr. Sawyer’s June 22 office notes, an IAC benefits analyst recommended that Simmons’s claims be denied as related to a preexisting condition, under the “prudent person” standard of the MUST II policy. IAC’s records indicated that Simmons was insured under the MUST II policy, and its employees did not know at that time that she had actually received a certificate of insurance referring only to a “MUST” policy and containing the definition of “pre-existing condition” applicable to the MUST I policy. In September 1994, IAC informed Simmons that it had denied her claims because, it said, she had incurred medical services for a preexisting condition.
When Simmons telephoned IAC to inquire about the denial of her claims, an IAC employee told her that she had the right to appeal if she did not agree with the manner in which the claims had been processed, and that she would need documentation from a physician stating why her condition was not a “pre-existing” one. In December 1994, Simmons sent IAC a handwritten letter requesting that it reconsider her claims. That letter states:
“Enclosed is a statement from my previous doctor that is treating me for my multiple sclerosis, also are the copies of my records you requested from the chiropractor I saw in the past. I would hope you would consider my situation. I’m very sick and I cannot handle the stress from this.
“I have to continue to see my doctor, but cannot afford cash payment. I would like for you to review my file and your denial of claims.”
Simmons sent with her letter records from her chiropractor regarding her treatment through May 1993 and a letter from Dr. Sawyer stating that “[ajfter [a] thorough evaluation, [he] felt [Simmons] had multiple sclerosis” and that the multiple sclerosis “ha[d] nothing to do with the previous *375 scoliosis and sciatica diagnosed by the chiropractor who had seen her in the past.”
Susan Foote, the IAC employee who reviewed Simmons’s appeal, testified that after she read Simmons’s letter and enclosures, the first thing she did was to confer with Bill Toole, Congress’s consultant to IAC. Foote testified that Toole reviewed all claims that had been denied on the basis of a preexisting condition as judged by the “prudent person” standard. Foote said she had determined that the chiropractor’s records forwarded by Simmons did not include records of the last four months of her treatment and that she advised Toole that the records were incomplete. She also testified that she asked him “whether or not the records that we did have in-house created an underwriting issue, as this was information for treatment prior to her effective date that was not disclosed on her application for coverage.” She stated that Toole advised her to get the additional records and then to forward those records to the underwriting department.
Foote testified that on several occasions IAC requested the complete records from the chiropractor, but that it never received them. Foote also testified that she “generated a system letter” advising Simmons that IAC had received her appeal, was waiting for complete records from the chiropractor, and “would advise her of the outcome once that information had been received.” IAC conducted no further investigation of Simmons’s appeal after it was unable to obtain a complete set of the chiropractor’s records concerning the treatment she had received for back pain before she was insured with Congress. Foote testified that in March 1995 she decided “to suspend the activity on the appeal for lack of the requested information.” She also testified that she drafted a letter to the chiropractor and sent a “system-generated letter” to Simmons, notifying both of them that IAC was suspending activity on the appeal and could not proceed further unless it received the chiropractor’s records for June through September 1993.
During the pendency of the appeal, Simmons continued to file insurance claims with IAC under her MUST policy with Congress. IAC denied all claims that contained a diagnosis code referring to back, neck, or joint pain or “disturbance of skin sensation,” on the basis of the “prudent-person” preexisting-condition exclusion. An IAC representative testified that IAC paid the few claims that contained the diagnosis code for multiple sclerosis and also paid claims for a condition that clearly was not related to the pain Simmons was experiencing in her back and neck. During this time, Congress raised Simmons’s health-insurance premium four times. Her initial monthly premium payment was $76.70. Two years later, her monthly premium had increased to $164.70. In May 1996, Simmons stopped making her premium payments because, she says, she could no longer afford them. Congress canceled her policy in June 1996.
II. Procedural History
Simmons sued Congress and IAC, alleging breach of her health-insurance contract and bad-faith refusal to pay claims and to reconsider the denial of claims. She moved for a partial summary judgment on her breach-of-contract claim, asking the trial court to declare Congress and IAC contractually liable, but to reserve the issue of the amount of a compensatory-damages award for a jury to determine. Congress and IAC moved for a summary judgment on the breach-of-contract and bad-faith claims. Congress and IAC also filed what they styled as a “motion for reformation of contract,” seeking to have Simmons’s insurance contract changed to *376 reflect that her coverage was governed by the MUST II policy provisions that should have applied to her, rather than the MUST I policy provisions that she received. On January 9,1997, the trial court denied Simmons’s motion for a partial summary judgment on the contract claim because, it said, the issue was not ripe for determination.
On January 15, 1997, Simmons moved for leave to amend her complaint to allege that IAC had denied 51 additional claims and to assert that the denials and premium increases had caused her to allow her policy to lapse in May 1996. That motion remains pending in the trial court.
On January 27, 1997, the trial court entered a summary judgment in favor of Congress and IAC as to Simmons’s bad-faith claims, but denied their motion for a summary judgment as to her breach-of-contract claim. The court also denied Congress and IAC’s motion for “reformation” of the contract. Congress and IAC then filed a motion in limine, or in the alternative, a motion for a partial summary judgment, concerning the scope of the damages Simmons was seeking in her breach-of-contract claim. Congress and IAC argued that because Simmons had allowed her policy to lapse, she should not be allowed to seek the future value of medical benefits that would have been available to her under her insurance policy. IAC also moved separately for a summary judgment on the ground that, as a contract administrator, it was not a party to the insurance contract. Simmons opposed both of these motions. On October 16, 1997, the trial court entered a partial summary judgment in favor of Congress and IAC on the issue of the scope of the damages Simmons would be allowed to seek on her breach-of-contract claim, holding that she could not seek to recover “as damages the value of her ‘future’ contract claims.” On November 21, 1997, the court entered a summary judgment in favor of IAC on all of Simmons’s claims against it. On February 7,1998, the trial court, acting pursuant to Rule 54(b), Ala.R.Civ.P., entered an order purporting to make its four rulings final.
In her certiorari petition, Simmons argued that the Court of Civil Appeals’ affir-mance of each of the trial court’s rulings in favor of Congress and IAC conflicted with prior caselaw of this Court and the Court of Civil Appeals. This Court, by order of July 8, 1999, granted her certiorari petition in part, to review only the following issues:
“(1) the summary judgment on the bad-faith claim, insofar as the Court of Civil Appeals held that the tort of bad faith could not have occurred arising from the insured’s appeal from an initial denial of her claim, or arising from the insurer’s ‘reconsideration’ of a denial; and
“(2) the question whether the appeal should be dismissed, insofar as it relates to the trial court’s holding that the plaintiff could not recover future damages on her contract claim, under the rule of Haynes v. Alfa Financial Corp., 730 So.2d 178 (Ala.1999) (that a Rule 54(b), Ala. R.Civ.P., certification of finality applies to an entire claim only and not to a ruling regarding the recovera-bility of some damages, but not all of the damages, sought in regard to a particular claim).”
We denied Simmons’s certiorari petition in all other respects.
While Simmons’s petition was before this Court, she asked this Court to remand the case for the limited purpose of allowing her to obtain leave of the trial court to amend her complaint to add Congress’s successor corporations as defendants. In *377 the alternative, she asked this Court to allow her to file an amended complaint adding as defendants Philadelphia Life Insurance Company and Conseco Life Insurance Company. We carried Simmons’s motion with the case and will address it in this opinion.
III. The Bad-Faith Claim
In affirming the summary judgment in favor of Congress[3] on Simmons’s claim alleging bad-faith failure to pay and to reconsider the denial of her insurance claims, the Court of Civil Appeals held:
“In this case, the ‘decision was made’ to deny coverage for claims 996006, 995855, 995854, 995276, and 995519 on September 21, 1994, when IAC first informed Simmons that her claims would be denied on the basis that the treatments referenced were for pre-existing conditions. Neither the information IAC received after that denial, nor its closure of its file concerning Simmons’s internal appeal from the denial, has any bearing upon whether the original denial was proper. If the tort of bad faith was committed, it was committed at the time of the original denial and no later. See Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1053 (Ala.1987) (‘Once the bad faith has occurred, once the duty to use good faith in considering insurance claims has been breached, the insurance company cannot later seek to justify its denial by gathering information which it should have had in the first place.’).
“At the time that Simmons’s five claims were denied, the information before IAC, the third-party claims administrator, included the claim forms filed by Simmons’s medical providers, none of which disclosed multiple sclerosis as a diagnosis code for which treatment was rendered. Also in IAC’s possession were Dr. Sawyer’s June 22, 1994, office notes, which related that Simmons had experienced a ‘variety of aches and pains of at least several months[’] duration,’ that her symptoms probably had begun about six months before her first visit to Dr. Sawyer, and that she had seen a chiropractor ‘during this time’ who had diagnosed, and treated her for, mild scoliosis and left sciatica.
“We have noted that Congress’s MUST II policy more broadly defines the term ‘pre-existing condition’ than the MUST I policy by (1) expanding the pertinent time period before coverage to 12 months from six months, and (2) incorporating a ‘prudent person’ standard to exclude conditions that could reasonably be said to have existed during that period but that were not treated. However, Dr. Sawyer’s references to Simmons’s having visited a chiropractor for treatment of scoliosis over the preceding six months before his seeing her on June 22, 1994, would have indicated that Simmons had seen a chiropractor for scoliosis and sciatica during the six-month period preceding her coverage date of May 31,1994.
‘We further note that our Supreme Court has broadly defined the concept of a ‘debatable reason’ for denying coverage. As stated in [National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179 (Ala.1982)], a ‘debatable reason’ ‘means an arguable reason, one that is open to dispute or question,’ and ‘[w]hen a claim is “fairly debatable,” the insurer *378 is entitled to debate it, whether the debate concerns a matter of fact or law.’ 417 So.2d at 183. We conclude that even under the MUST I pre-existing condition exclusion, coverage for claims 996006, 995855, 995854, 995276, and 995519 ... was fairly debatable in light of Dr. Sawyer’s office notes.
“Further, the fact that Simmons had applied for coverage under MUST II and IAC viewed her as being insured under MUST II bears upon the issue of whether Congress acted with intent to injure. Our Supreme Court has indicated that an insurer’s issuance of a certificate of insurance containing terms that differ from the terms of a master policy does not destroy an insurer’s right to rely upon the master policy, at least for purposes of determining ‘debatability’ of a claim under Bowen. In Peek v. Reserve Nat’l Ins. Co., 585 So.2d 1303 (Ala.1991), ... [our Supreme Court] affirmed a summary judgment in favor of the insurer on the insured’s bad faith claim, concluding that a doctor’s reports indicating that the ovarian cyst had existed for over a year before the effective date of coverage constituted an ‘arguable or debatable reason’ for denying the insurance claim, notwithstanding the insurer’s failure to deliver an insurance certificate containing the exclusion. 585 So.2d at 1309....
“Because the existence of a debatable reason for denying coverage is to be tested based upon the materials before the insurer at the time the claim is denied, and no later, and because the materials submitted to IAC before Simmons’s claim was denied on September 21, 1994, indicated the existence of such a debatable reason, we conclude that the trial court properly entered the summary judgment in favor of Congress on Simmons’s bad faith claim. That portion of the trial court’s judgment is due to be affirmed.”
791 So.2d at 367-69 (footnotes omitted).
We agree with the Court of Civil Appeals that Simmons did not submit substantial evidence indicating that IAC initially denied her claims in bad faith. We do not agree, however, with the Court of Civil Appeals’ statement, made in reliance on Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050 (Ala.1987), that “[i]f the tort of bad faith was committed, it was committed at the time of the original denial and no later.” 791 So.2d at 367. This Court has provided in two recent cases comprehensive discussions of the tort of bad-faith failure to pay an insurance claim grounded upon an insurer’s failure to properly investigate the disputed claim. In Employees’ Benefit Ass’n v. Grissett, 732 So.2d 968 (Ala.1998), we stated:
“[National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179 (Ala.1982)] set out these requirements for a plaintiff to prove a bad-faith failure to pay:
“ ‘(a) an insurance contract between the parties and a breach thereof by the defendant;
“ ‘(b) an intentional refusal to pay the insured’s claim;
“ ‘(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
“ ‘(d) the insurer’s actual knowledge of the absence of any legitimate or arguable reason;
“ ‘(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer’s intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.’ *379 "417 So.2d at 183. Requirements (a) through (d) represent the ‘normal’ case. Requirement (e) represents the ‘abnormal’ case.
“The rule in ‘abnormal’ cases dispensed with the predicate of a prever-dict JML [judgment as a matter of law] for the plaintiff on the contract claim if the insurer had recklessly or intentionally failed to properly investigate a claim or to subject the results of its investigation to a cognitive evaluation. Blackburn v. Fidelity & Deposit Co. of Maryland, 667 So.2d 661 (Ala.1995); Thomas v. Principal Financial Group, 566 So.2d 735 (Ala.1990). A defendant’s knowledge or reckless disregard of the fact that it had no legitimate or reasonable basis for denying a claim may be inferred and imputed to an insurer when it has shown a reckless indifference to facts or proof submitted by the insured. Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916, 924 (Ala.1981).
“So, a plaintiff has two methods by which to establish a bad-faith refusal to pay an insurance claim: he or she can prove the requirements necessary to establish a ‘normal’ case, or, failing that, can prove that the insurer’s failure to investigate at the time of the claim presentation procedure was intentionally or recklessly omissive.”
732 So.2d at 976 (footnote omitted).
In State Farm, Fire & Casualty Co. v. Slade, 747 So.2d 293 (Ala.1999), we elaborated on the rule in the “abnormal” case.
“We reject the Slades’ argument that in the abnormal bad-faith case in which the insurer fails to properly investigate the insured’s claim contractual liability is not a prerequisite to bad-faith liability, and the Slades’ argument that the tort of bad faith provides a cause of action that is separate and independent of an insurance contract. In so doing, we make it clear that in order to recover under a theory of an abnormal case of bad-faith failure to investigate an insurance claim, the insured must show (1) that the insurer failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review and (2) that the insurer breached the contract for insurance coverage with the insured when it refused to pay the insured’s claim.
“This is nothing new. Under the elements established in Bowen, supra, the plaintiff has always had to prove that the insurer breached the insurance contract. Practically, the effect is that in order to prove a bad-faith-failure-to-investigate claim, the insured must prove that a proper investigation would have revealed that the insured’s loss was covered under the terms of the contract.”
747 So.2d at 318.
The Court of Civil Appeals has frozen the bad-faith inquiry at the moment of denial, in reliance upon Lavoie, supra. In Lavoie, this Court held that postdenial efforts to develop facts that would support a good-faith denial of the claim could not be used to overcome an initial denial made in bad faith and reiterated on numerous subsequent occasions before the insurer sought pertinent information that was missing from the file. It would stand the logic of Lavoie on its head to say that an insurer acting initially in good faith when denying a claim is thereafter exempt from liability for acting in bad faith if, notwithstanding information subsequently received on reconsideration, it declines in bad faith to alter its position.
In Simmons’s case, although IAC sought additional information during the “appeal” process, it perfunctorily “suspended activity” on her appeal, on the basis that it was unable to obtain a complete set of records *380 from her chiropractor.[4] Testimony from Foote, the IAC employee who reviewed Simmons’s appeal, reflects that no meaningful investigation was ever undertaken.
“Q. What else did you do — let me ask you this: What is your understanding what is the purpose of the appeal process [sic]?
“A. It’s a means [by] which the insured person can voice their disagreement, if you will, with our handling of claims. And it was ... my responsibility to review the information and determine if the handling of the claims — if the claims were handled in a correct fashion.
“Q. Would that include basically reviewing the benefit analyst or the adjuster who made the decisions, just seeing if you agreed that their decision was a correct decision?
“A. In some cases. But in the preexisting situation, the preexisting investigation unit generally makes the decision. The processor or the benefit analyst just handles the claim. But there are on occasion, yes, we do actually look at the decision-making by the benefit analyst as well.
“Q. Okay. Well, in this case we already established that Barbara Brist was the person who made the decision ... to deny the claims that are made the basis of this lawsuit. In your handling of the appeal what did you do to review the facts surrounding her decision?
“A. I didn’t get to that point, unfortunately, because I was not successful in getting those records from [the chiropractor’s] office.
“Q. But had those records come in, you would have then looked at everything to determine whether you agreed with her decision?
“A. Actually, I probably would have followed Bill Toole’s directive, which was, you know, get the records. Once the records are received, refer it to underwriting for review.
“Q. Now, at some point did you review Dr. Sawyer’s records?
“A. No, sir, I did not.
“Q. Did you in response to the letter that was provided to you from his office, did you ever get in touch with him?
“A. No, sir.
“Q. Did you ever in response to the appeal process, did you ever get in touch with or talk directly to Laura Simmons?
“A. No, sir, I did not.
“Q. If the purpose of the appeal process is to look into and try to decide whether or not the denial was correct and Miss Brist made her denial without the chiropractor records available to her, why was it important before the appeal process could continue that the chiropractic records be received?
“A. I believe it was important because the treatment dates did go within the year prior to her effective date. And also on a second note, it did present the underwriting issue relative to nondisclosure of treatment.
“Q. Okay. But besides the underwriting issue, which they, in essence, wanted the additional records for to go for the underwriting decision [sic], what did you — did you feel like the chiropractic records were necessary to review Barbara Brist’s decision?
*381 “A. Well, I knew we didn’t have the records previously, and I knew that in obtaining those records, it would provide our position, IAC’s position — it would give them a much — a better basis on which we were upholding the denial of the claims.”
Lavoie does not serve as a shield to protect an insurer from the consequences of actions taken in bad faith during a “reconsideration” or an “appeal.” Like the plaintiff in Grissett, Simmons submitted substantial evidence establishing a material question of fact regarding whether the insurer, through its administrator, “recklessly or intentionally failed to properly investigate [her] claim or to subject the results of an investigation to a cognitive evaluation.” 732 So.2d at 978. Cf. Gonzalez v. Blue Cross/Blue Shield of Alabama, 689 So.2d 812 (Ala.1997); and King v. National Found. Life Ins. Co., 541 So.2d 502 (Ala.1989), wherein this Court held that on reconsideration after a denial, the insurers conducted themselves so as to preclude a finding of bad faith. Therefore, the Court of Civil Appeals erred in affirming the summary judgment in favor of Congress on Simmons’s bad-faith claims.
IV. Extracontractual Damages
Simmons argues that the Court of Civil Appeals erred in affirming the partial summary judgment in favor of Congress regarding her recovery of future damages based upon proof that Congress breached its contract of insurance. Simmons appealed as to this issue because the trial court entered a Rule 54(b) certification relating to its order limiting the scope of allowable compensatory damages on her breach-of-contract claim. However, Rule 54(b) does not contemplate an order purporting to make final an order disposing of only part of a claim. Ex parte Kimberly-Clark Corp., [Ms. 1990075, June 9, 2000].* Rule 54(b) applies only to entire claims, not to orders relating to the recoverability of some, but not all, of the damages a party may be seeking as the result of a claim. Haynes v. Alfa Fin. Corp., 730 So.2d 178 (Ala.1999). As we stated in Haynes, “for a Rule 54(b) certification of finality to be effective, it must fully adjudicate at least one claim or fully dispose of the claims as they relate to at least one party.” Id. at 181. Either of the parties could have sought permission to appeal this interlocutory order, pursuant to Rule 5, Ala.R.App.P., but neither did so. The partial summary judgment on the question of damages is an interlocutory order that is “subject to revision at any time” and therefore is not appealable. Rule 54(b). Therefore, the Court of Civil Appeals could not affirm that order; that portion of its judgment purporting to affirm that interlocutory order must be vacated.
V. Motion to Remand
On March 31, 2000, Simmons moved this Court to remand her case “for the limited purpose of allowing [her] to obtain leave of the trial court to amend her complaint to add Philadelphia Life Insurance Company [‘Philadelphia Life’] and Conseco Life Insurance Company [‘Conseco’] as defendants herein ... to avoid a ‘failure to join necessary parties’ argument by the Defendants.” As support for her motion, Simmons refers us to the affidavit of Scott Wood, IAC’s executive vice president and *382 chief operating officer, in which Wood states that “the MUST II group insurance policy was assumed by Philadelphia Life ... on June 1, 1996.” This affidavit appears in the record on appeal. Simmons also contends in her motion that Philadelphia Life merged with Conseco “on or around December 31, 1998.” In the alternative, Simmons asked this Court to grant her motion for leave to amend. Simmons requested an immediate ruling on her motion, “to avoid any argument by the Defendants that the statute of limitations has run.” In response to her motion, Congress contends there is no procedural authority by which this Court can allow a plaintiff to file an amended complaint in the trial court; that the motion relies upon information in an affidavit that was filed approximately three years ago; that there is no reason Simmons could not have waited and filed her motion to amend the complaint after the appeal is decided; and that Simmons does not cite any threat of immediate prejudice.
Rule 25(c), Ala.R.Civ.P., directly addresses the action Simmons wishes to take in this case:
“In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party.”
Rule 25(c) clearly allows Simmons, upon remand, to continue her action against Congress or move the trial court to substitute or join Philadelphia Life and/or Con-seco.
VI. Conclusion
We reverse the judgment of the Court of Civil Appeals insofar as it affirms the summary judgment in favor of Congress on Simmons’s claim of bad faith, and we vacate the judgment of the Court of Civil Appeals insofar as it purports to affirm the partial summary judgment in favor of Congress on Simmons’s claim for extracontrac-tual damages. In all other respects, we affirm the judgment of the Court of Civil Appeals, and we remand for that court to enter an order consistent with this opinion.
Because the Rules of Civil Procedure obviate Simmons’s concerns that Congress could make failure-to-join or statute-of-limitations arguments, her motion to remand or for leave to amend her complaint is denied.
MOTION TO REMAND OR FOR LEAVE TO AMEND COMPLAINT DENIED; AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART; AND REMANDED.
HOOPER, C.J., and COOK, JOHNSTONE, and ENGLAND, JJ., concur.
MADDOX, SEE, and BROWN, JJ., concur in the result.
HOUSTON, J., concurs in part and dissents in part.

. Congress and IAC did not petition for cer-tiorari review of the Court of Civil Appeals’ affirmance of the judgment denying the motion to "reform" the insurance contract.

. The question whether the contract of insurance could have been voided on the ground of fraud is not before us.

. Because the Court of Civil Appeals has affirmed the trial court’s summary judgment in favor of IAC as to all of Simmons’s claims, and because we have not granted certiorari review as to any issue relating to that affir-manee, our discussion of the issues we have agreed to review will be limited to issues relating to Simmons’s claims as to Congress only.

. Even though Grissett and Slade had not been decided at the time, the record reflects that Simmons argued to the trial court and to the Court of Civil Appeals that IAC's conduct during the appeal process would support a determination of bad-faith failure to pay or to reconsider the denial of her claims, both as to IAC and as to Congress.

 Note from the reporter of decisions: On September 8, 2000, on application for rehearing, the Supreme Court withdrew its June 9, 2000, opinion in Kimberly-Clark and substituted another opinion. The June 9, 2000, opinion carried the judgment line "WRIT DENIED"; the opinion substituted on September 8, 2000, carried the judgment line "[REHEARING] APPLICATION GRANTED; OPINION OF JUNE 9, 2000, WITHDRAWN; OPINION SUBSTITUTED; PETITION GRANTED; WRIT ISSUED." See 779 So.2d 178.