James Kenneth Webb, Jr., appeals from a summary judgment entered in favor of International Indemnity Company on his claim that International Indemnity acted in bad faith by refusing to pay a claim filed pursuant to his insurance policy. We affirm.
On October 31, 1989, Webb was involved in an automobile accident with Butch Weaver. Weaver's insurance carrier, Alfa Insurance Company, accepted liability for Webb's property damages, and International Indemnity was notified of that fact in November 1989. It appears that in November Webb's attorney notified International Indemnity that he was attempting to work out a settlement with Alfa with regard to the damage to the vehicle; however, the settlement fell through for the entire amount of the loss and Webb then sought compensation from International Indemnity. He also sought compensation for the money expended on a rental vehicle.[1] In support of its motion for summary judgment, International Indemnity offered the affidavit of Kelly Banks, who handled Webb's claim for International Indemnity. In her affidavit, Ms. Banks stated that she opened a claim file for Webb on November 7, 1989, and requested a police report on that date. She further stated that she wrote a letter to Webb inquiring as to whether he would be making a claim pursuant to his collision coverage. She said that on November 15 she was notified that Weaver's insurer, Alfa, would be handling his damage claim, so that when she received the police report toward the end of November she took no further action, because no claim had been filed. According to Ms. Banks's affidavit, correspondence from Webb's attorney was thereafter forwarded to Ms. Banks; that correspondence referenced damages "not otherwise satisfied by Alfa." She stated that she called Webb's attorney on January 11, 1990, and the following is recorded in her "case development summary":
 "Advised (by attorney) claim previously settled now rejected, but in process of working out. Wants to make claim for difference in settlement and pay off?? Tried to explain didn't think possible."
Banks stated in her affidavit:
 "During this conversation, I told counsel for plaintiff that he would either have to accept the settlement on the property damage with Alfa and allow us our subrogation rights, or alternatively, on behalf of his client he could file a collision damage claim on our policy. That is what is referenced by my note that I tried to explain: I did not think it possible for him to get the difference from what he would obtain from Alfa, or what he wanted from us. We did go ahead and pay the Med Pay on the Med Pay *Page 1146 
provision of the policy, in response to request by plaintiff."
She further stated:
 "As my case development summary reflects, on June 8, I received a letter from plaintiff's counsel with a rental bill. The letter indicated a payoff of $11,500 [on the loan on the damaged vehicle] — claimant paying $6,700 and wants us to pay the balance. This letter is found on page 39 of the claim file.
 "On June 22, my entry on the case development sheet shows:
 " 'Spoke with the attorney advised no coverage for rental, and again explained, cannot pay balance for loan damages. Now Claimant is paying $7500 and Volvo will accept 50% of loan balance. Will send photos of car has now been salvaged [sic].'
". . . .
 "On page 33 of the claim file there is a July 25, 1990 letter from counsel for plaintiff. While the request was made to process plaintiff's claim 'for all the damages covered by his policy,' there still was no response as to whether plaintiff's counsel wanted to reach an independent settlement with Alfa with regard to the property damage on the car and allow International Indemnity's subrogation rights; or alternatively, file a claim on the collision coverage of the plaintiff's car with our company. As the case development sheet reflects, I spoke with counsel for plaintiff on July 30 and advised that I would review the situation and advise him of my response.
 "The case development file reflects that on August 7, I discussed this matter with Louise Glass, my immediate supervisor. She confirmed that the plaintiff must go one way or another, and if a collision claim was made we would need to see the car.
 "As the case development file reflects, we received counsel for plaintiff's August 20 letter on August 24.
 "Thereafter, on September 6, I wrote counsel for plaintiff, as reflected on page 31 of the claim file, because it was still uncertain as to whether plaintiff intended to process his collision claim on our policy. I noted that we would need to inspect the damages to the vehicle 'if Mr. Webb intends to process his collision claim under this policy.' "
After having difficulty locating the wrecked vehicle for examination, International Indemnity did locate it in September 1990, and it inspected the vehicle on October 3. International Indemnity made an offer of settlement to Webb on October 22, 1990.
This Court has written:
 "This Court formally recognized the tort of bad faith failure to pay an insurance claim in Chavers v. National Security Fire Casualty Co., 405 So.2d 1 (Ala. 1981). The elements of a bad faith action are:
 "(a) an insurance contract between the parties and a breach thereof by the defendant;
 "(b) an intentional refusal to pay the insured's claim;
 "(c) the absence of any reasonably legitimate or arguable reason for that refusal;
 "(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
 "(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.
 "National Security Fire Casualty Co. v. Bowen, 417 So.2d 179, 183 (Ala. 1982)."
Miller v. Preferred Risk Mut. Ins. Co., 572 So.2d 1260, 1262
(Ala. 1990).
 " 'Moreover, this Court has made it abundantly clear that an action for bad faith lies only where the insurer has acted with an intent to injure.' Blue Cross Blue Shield v. Granger, 461 So.2d 1320, 1327 (Ala. 1984)."
Coleman v. Gulf Life Ins. Co., 514 So.2d 944, 946 (Ala. 1987). *Page 1147 
It is clear from Ms. Banks's affidavit that there was no bad faith involved in the case at bar, and that the trial court correctly entered International Indemnity's summary judgment. Although there may have been some miscommunications between the parties (e.g., Ms. Banks said, "While the request was made to process plaintiff's claim 'for all the damages covered by his policy,' there still was no response as to whether plaintiff's counsel wanted to reach an independent settlement with Alfa with regard to the property damage on the car and allow International Indemnity's subrogation rights; or alternatively, file a claim on the collision coverage of the plaintiff's car with our company"), there simply was no evidence offered by the plaintiff tending to show that International Indemnity was, as he said, "stringing him along." In fact, International Indemnity paid Webb's medical claims from the outset.
Webb contends that our recent opinion in Livingston v. AutoOwners Ins. Co., 582 So.2d 1038 (Ala. 1990) (wherein this Court held that a jury question was presented with regard to a failure to pay on Mrs. Livingston's insurance contract within 3 months of the fire that destroyed her residence) stands for the proposition that the delay in this case created at least a jury question on the issue of bad faith. We disagree. In Livingston, fire destroyed a rental house owned by the Livingstons. The house had been insured by Auto Owners and, while the fire was determined to have been deliberately set, there was absolutely no evidence linking the fire to the Livingstons. We held:
 "While Auto Owners never directly denied Mrs. Livingston's claim, the evidence was such that a jury could find that its prolonged investigation after all the facts had been gathered amounted to a last-ditch effort to find some evidence to support its suspicions that the Livingstons started the fire and, thus, to deny the claim. A jury could find that this effectively amounted to a denial of the claim. Auto Owners asserts that Mrs. Livingston's suit was premature because, it says, it had not completed its investigation when the suit was filed. However, based on the evidence a jury could find there was nothing more that Auto Owners could investigate. While we agree that Auto Owners had the right to conduct a reasonable investigation into the loss, it did not have the right to prolong the investigation and delay action in such a manner as to defeat the rights of its insured. Moreover, Auto Owners could not continue an investigation based solely on its unsupported suspicions and its hopes that it would turn up evidence that the Livingstons were responsible for the fire when nothing had been discovered that pointed to that conclusion. We hold, therefore, that under the facts of this case, a jury could find that Auto Owners' investigation was protracted and that its delay was unwarranted and amounted to a denial of Mrs. Livingston's claim.
". . . .
 "As we have stated, there was evidence that Auto Owners unceasingly attempted to uncover evidence that would indicate that the Livingstons were responsible for the fire. The evidence indicates that this was done even after the reports submitted by the investigators and the adjusters, as well as the state fire marshal, presented nothing to indicate culpability on the part of the Livingstons. We find no evidence in the record that could even remotely tie the Livingstons to the setting of the fire. All that Auto Owners had was its suspicions.
". . . .
 "Given the fact that Auto Owners based its denial solely on its unsupported suspicions of arson by the insured, Mrs. Livingston presented more than substantial evidence that Auto Owners' failure to pay was made in bad faith. The evidence presented by Mrs. Livingston could raise an inference that Auto Owners' denial was made in bad faith, as the facts tend to show it had no legal, justifiable, arguable, or debatable reason for the denial, and the evidence easily satisfies the substantial evidence requirement."
582 So.2d at 1042-43.
 "As we noted in Chavers v. National Security Fire Casualty Co., *Page 1148 456 So.2d 293, 294 (Ala. 1984), the accrual of a claim for bad faith is a question that must be determined by the circumstances of each case."
Miller v. Preferred Risk Mut. Ins. Co., 572 So.2d 1260 (Ala. 1990). Under the facts of this case, there simply was no evidence of an intention to deny the claim. International Indemnity paid Webb's medical claims, and it appears from the evidence that it awaited Webb's decision regarding whether he would be able to settle the claim with Alfa. Although Webb contends that International Indemnity ignored his demands to settle the claim, the record indicates that at best there was a misunderstanding between Webb and International Indemnity as to his intentions with regard to whether he would be processing his claim with Alfa.
For the foregoing reasons, the summary judgment is hereby affirmed.
AFFIRMED.
HORNSBY, C.J., and ALMON, STEAGALL and INGRAM, JJ., concur.
[1] It appears that Webb's attorney continuously sought reimbursement for the rental expenses of another vehicle; however, such expenses were not covered by his insurance policy.