[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 5, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-13046

_____

D. C. Docket No. 01-00473-CV-F-N

MUTUAL SERVICE CASUALTY
INSURANCE COMPANY,

Plaintiff-Counter-
Defendant-Appellee,

versus

RONALD HENDERSON,
PHYLLIS HENDERSON,

Defendants-Counter-
Claimants-Appellants,

MYRON ANDERSON, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

**(May 5, 2004)**

Before MARCUS and WILSON Circuit Judges, and LIMBAUGH[*], District Judge.

WILSON, Circuit Judge:

Ronald and Phyllis Henderson ("the Hendersons") appeal the district court's summary judgment order dismissing their bad faith claim against Mutual Service Casualty Insurance Company ("MSC"). They also appeal the court's denial of their motion for judgment as a matter of law on their breach of contract claim.

While we find no error with respect to the Hendersons's "normal" bad faith claim, the district court erred in dismissing the Henderson's "abnormal" bad faith claim. Thus, we reverse the district court's summary judgment ruling on bad faith and remand for further proceedings. Furthermore, we affirm the district court's denial of the Hendersons' motion for judgment as a matter of law on their breach of contract claim. Even if there was error, it was harmless because the Hendersons eventually won a jury verdict on their breach of contract claim.

## BACKGROUND

The Hendersons live in rural Alabama, on approximately forty acres of land. In 1998, the Hendersons made plans to enter into the poultry-farming business and began construction of two poultry houses in late 1998 or early 1999. On January

---

[*]Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri, sitting by designation.

15, 1999, several of the Hendersons' neighbors (the "Neighbors"), having discovered the Hendersons' plans, brought suit in state court seeking equitable relief to prevent the Hendersons from constructing and operating the poultry-farming venture. The Neighbors alleged in their complaint that if the Hendersons operated a poultry farm, the Neighbors' property would be subject to noxious odors, excessive noise, increased rodent and insect populations, and waste runoff. The Hendersons answered, and there was no further action in the lawsuit for a year and a half.

In the meantime, the Hendersons finished construction of the poultry houses. The Hendersons took steps during the construction of the poultry houses to minimize the impact of the venture on their neighbors. The poultry houses were specially positioned, and the Hendersons planted and irrigated a line of trees along the property to reduce exposure. The Hendersons also state that their poultry operation was inspected by the Alabama Department of Environmental Management in March 1999, without adverse consequence, and they obtained a waste management plan for the venture from the Covington County Soil Conservation Office in May 1999. In August 1999, the Hendersons began operating the poultry farm, and they did not receive any further complaints from their neighbors until June 2000.

In April 2000, Chris Wilkes of the Pinckard Agency contacted Ronald Henderson to renew his farm insurance. At the time, the Hendersons had farm insurance with Fulcrum Insurance Company, and it was due to expire in May 2000. The Pinckard Agency is an independent insurance agency and initially purchased insurance for the Hendersons from Fulcrum. By April 2000, however, Pinckard had established a business relationship with Southern Select Insurance, which was a general agent for Keystate Agri-Business Insurance, which itself was a managing general agent for MSC.

After speaking with Mr. Henderson, Wilkes submitted a completed, but unsigned, MSC insurance application on behalf of the Hendersons to Southern Select, soliciting a quote for farm insurance. The application asked, "Has applicant or any member of the household ever been involved in litigation, whether or not covered by the insurance?" Wilkes checked "No." Wilkes said that, at the time, he did not know that the Hendersons were involved in the lawsuit with their Neighbors, nor did Wilkes ask Mr. Henderson about prior lawsuits during his meeting with him. Mr. Henderson claims, however, that when Wilkes visited him, he told Wilkes that his neighbors had complained about the poultry farm venture and had signed a "petition" against him. Mr. Henderson also claims they discussed the measures he had taken to minimize any chance of injury to his

4

neighbors. Wilkes only remembers generally being told that "the neighbors weren't happy about the chicken house."

After Wilkes sent the unsigned application to Southern Select, the Pinckard Agency received a quote for the farm insurance to be provided by MSC. After receiving the quote, Wilkes brought the application to Mr. Henderson for him to sign. On the same page as the question regarding whether the applicant had ever been involved in a lawsuit, the following appears:

> I have read the above application, and I declare that to the best of my knowledge and belief, all the foregoing statements are true, and that these statements are offered as an inducement to the company to issue the policy for which I am applying.

Henderson signed the application. He says that he did not read the above quoted language. He also claims that the application was not filled out when he signed it. Mr. Henderson only remembers signing a document on the hood of his truck when Wilkes brought it to him. He believed that Wilkes was going to answer the questions for him on his behalf. Wilkes alleges instead that the document was complete when Mr. Henderson signed it.

Wilkes sent the signed application to Southern Select, and in August 2000, MSC issued the Hendersons an insurance policy with an effective date of May 15, 2000.

In June 2000, the Neighbors amended their complaint against the Hendersons to state claims for actual damages akin to those anticipated in their original complaint. The amended complaint did not, however, state a date upon which the alleged damages or the event causing the alleged damages occurred.

In September 2000, Mr. Henderson spoke with Chris Wilkes regarding whether the Neighbors' suit was covered under the MSC policy. Wilkes wrote in a letter dated September 28, 2000, that the Neighbors' suit originally filed in January 1999 was "outside of the [Hendersons'] policy period" and that "no policy . . . was in force at that time." Wilkes admittedly undertook no investigation of the claim other than comparing the date of the policy with the date the original anticipatory nuisance suit was filed.

On January 4, 2001, counsel for the Hendersons – unaware of the September 28, 2000 letter – wrote to the Pinckard Agency soliciting a response as to whether the MSC policy provided coverage. She enclosed a copy of the original and amended complaints from the Neighbors' suit against the Hendersons. The Hendersons' lawyer also faxed a copy of the letter to MSC. When no response followed, counsel for the Hendersons sent another letter to the Pinckard Agency on February 6, 2001, again faxing a copy of its letter to MSC.

In response, Steve Atwood, the Farm Department Manager at Keystate, wrote a letter to Greg Wilkes of the Pinckard Agency. In the letter, dated February 8, 2001, Atwood (1) stated that MSC had not received a formal notice of the claim, (2) referred Greg Wilkes to the pollution exclusion found in the Hendersons' policy, and (3) requested a written explanation as to how the misstatement about prior litigation in the application came about. Atwood also stated that, in his opinion, if a claim were submitted on this suit, the policy would provide no coverage.

The Hendersons' counsel responded in writing on February 22, 2001, stating the Hendersons' objections and requesting that Keystate reconsider its denial of coverage and retain Alabama counsel to advise it of its duties under the policy. Keystate complied with the Hendersons' request and submitted the case to outside counsel for review.

On April 19, 2001, Mimi Anderson, a claims administrator for Keystate, responded to the Hendersons' request for reconsideration, stating that outside counsel confirmed their conclusion that coverage for the Neighbors' case was not available to the Hendersons. Anderson's letter based the denial of coverage on (1) the "known loss" rule, (2) the fact that the claims asserted by the Hendersons' neighbors did not qualify as an "occurrence" under the policy, and (3) the

7

misstatement about involvement in prior litigation in the application. The letter further stated that MSC did not rely on the pollution exclusion or the lack of formal notice of the claim in denying coverage, as was earlier indicated by Atwood in his February 8, 2001 letter. Anderson also informed the Hendersons that MSC would file a declaratory judgment action.

In April 2001, MSC filed suit in federal court against the Hendersons seeking (1) declaratory judgment that it had no duty to defend or pay any judgment against the Hendersons for their suit with the Neighbors, and (2) rescission of the policy.[1] The Hendersons asserted two counterclaims against MSC claiming breach of contract and bad faith. MSC filed a motion for summary judgment. The district court granted MSC's motion for summary judgment only in regard to the Hendersons' bad faith claim.

The case proceeded to trial. At trial, the Hendersons moved for judgment as a matter of law on their breach of contract claim. The court denied the motion. The jury returned a verdict in favor of the Hendersons and awarded them $10,800 in damages for their breach of contract claim.

---

[1] The Neighbors are also named as defendants in the complaint.

The Hendersons appeal, alleging the district court erred by (1) granting MSC's summary judgment motion with regard to the Hendersons' claim of bad faith, and (2) denying their motion for a judgment as a matter of law at trial.

## DISCUSSION

### I. Standard of Review

We review the district court's grant of summary judgment *de novo*, applying the same standards as the district court. *Nat'l Fire Ins. Co. of Hartford v. Fortune Constr.*, 320 F.3d 1260, 1267 (11th Cir. 2003). A motion for summary judgment should be granted when there is no issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). We review the evidence and all reasonable inferences in the light most favorable to the non-moving party. *Nat'l Fire Ins.*, 320 F.3d at 1267.

Motions for judgment as a matter of law are also subject to *de novo* review. *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1289 (11th Cir. 1998).

### II. Bad Faith

Under Alabama law, there are two methods by which a party can establish a bad faith refusal to pay an insurance claim. *Employees' Benefit Assoc. v. Grissett*, 732 So.2d 968, 976 (Ala. 1998). An insurance company may be liable for either

9

"normal" bad faith or "abnormal" bad faith. *State Farm Fire & Casualty Co. v. Slade*, 747 So.2d 293, 306 (Ala. 1999). We address each theory in turn.

### A. "Normal" Bad Faith

A party alleging that an insurance company committed "normal" bad faith has the burden of proving: (1) a breach of the insurance contract; (2) an intentional refusal to pay the insured's claim; (3) the absence of any reasonably legitimate or arguable reason for that refusal; and (4) the insurer's actual knowledge of the absence of any legitimate or arguable reason. *Grissett*, 732 So.2d at 976. "Normal" bad faith claims are often referred to as "directed verdict on the contract claim[s]," *Blackburn v. Fid. and Deposit Co. of Maryland*, 667 So.2d 661, 668 (Ala. 1995), because a plaintiff must show that he is entitled to a directed verdict on the breach of contract claim in order to have his bad faith claim submitted to a jury. *Grissett*, 732 So.2d at 976; *Nat'l Sav. Life Ins. Co. v. Dutton*, 419 So.2d 1357, 1362 (Ala. 1982). Thus, we review whether there was a "legally sufficient evidentiary basis" for a reasonable jury to find for MSC on the breach of contract claim. ALA. R. CIV. P. 50(a); *see also Dutton*, 419 So.2d at 1362 ("Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the ["normal" bad faith] claim must fail and should not be submitted to the jury.").

10

While the jury returned a verdict in favor of the Hendersons on the breach of contract claim, we find that evidence was presented that would have allowed a reasonable jury to conclude that the Neighbors' lawsuit was not covered by the MSC policy. The Hendersons' MSC insurance policy states that MSC will cover any "property damage" caused by an "occurrence." An "occurrence" is defined in the policy as an "accident . . . that results in . . . property damage during the policy period." The damage claims set out in the Neighbors' amended complaint arguably do not constitute an "accident." The Hendersons began operating the poultry venture and allegedly damaged their neighbors' property prior to applying for coverage with MSC and in spite of their knowledge of their neighbors' objections. The Hendersons arguably did not commit an "accident," but rather purposefully accepted the foreseen consequences of operating their poultry farm. The district court was correct in holding that the Hendersons were not entitled to a directed verdict on the breach of contract claim, and thus were precluded from bringing their "normal" bad faith claim before a jury.

The Hendersons argue in the alternative that even if there was uncertainty as to whether there was an "occurrence" or an "accident," MSC at least owed the Hendersons the duty to defend as a matter of law. *See Aetna Cas. & Surety Co. v. Dow Chem. Co.*, 44 F.Supp.2d 847, 856 (E.D. Mich. 1997). Yet, such a holding

11

would clearly contravene Alabama law. Under Alabama law, "if there is any uncertainty as to whether the complaint alleges facts that would invoke the duty to defend, the insurer must *investigate* the facts surrounding the incident that gave rise to the complaint in order to determine whether it has a duty to defend the insured." *Blackburn*, 667 So.2d at 668 (emphasis added). Thus, MSC's uncertainty as to whether there was an "occurrence" or an "accident" did not create a duty to defend, but rather a duty to investigate. *Id.* The question of whether MSC properly investigated the claim is the subject of an "abnormal" bad faith inquiry rather than a "normal" bad faith inquiry. *See Simmons v. Congress Life Ins. Co.*, 791 So.2d 371, 379 (Ala. 2000).

The district court did not err in denying the Hendersons' "normal" bad faith claim. We now turn to consider the Hendersons' "abnormal" bad faith claim.

B. "Abnormal" Bad Faith

Under Alabama law, "[i]n order to recover under a theory of an abnormal case of bad faith failure to investigate an insurance claim, the insured must show (1) that the insurer failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review and (2) that the insurer breached the contract for insurance coverage with the insured when it refused to pay the insured's claim." *Simmons*, 791 So.2d at 379. There is no dispute with

12

regard to the second element. With regard to the first element, the Hendersons

argue that the district court erroneously concluded that there was no issue of

material fact with respect to whether MSC properly investigated their claim before

denying coverage. We agree.

An insurer is liable for "abnormal" bad faith when it intentionally or

recklessly fails to conduct an adequate investigation of the facts and submit those

facts to a thorough review. *See Blackburn*, 667 So.2d at 668. An insurer also has

the responsibility to "marshal all of the pertinent facts with regard to its insured's

claim" before denying coverage. *See Nat'l Ins. Ass'n. v. Sockwell*, 829 So.2d 111,

130 (Ala. 2002). Unlike in "normal" bad faith claims, providing an arguable

reason for denying an "abnormal" bad faith claim does not defeat that claim. *See*

*Slade*, 747 So.2d at 315-16.[2]

---

[2] MSC urges us to follow the holding of *Weaver v. Allstate Ins. Co.*, 574 So.2d 771 (Ala. 1990) and conclude that a debatable reason is enough to defeat an "abnormal" bad faith claim. Indeed, in *Weaver*, the Alabama Supreme Court said that "regardless of the imperfections of [the insurer's] investigation, the existence of a debatable reason for denying the claim at the time the claim was denied defeats a bad faith failure to pay the claim." *Id.* at 775 (quoting *State Farm Fire and Cas. Co. v. Balmer*, 891 F.2d 874, 877 (11th Cir. 1990)). However, as the theory of "abnormal" bad faith developed, the Alabama Supreme Court has moved away from its holding in *Weaver*.

For example, in 1998, the Alabama Supreme Court said that the absence of an arguable basis for denying the claim can be inferred if the insurer was reckless in its investigation:

> The rule in "abnormal" cases dispensed with the predicate of [demonstrating entitlement to a directed verdict] on the contract claim if the insurer had recklessly or intentionally failed to properly investigate a claim to subject the results of its investigation to a cognitive evaluation. A defendant's knowledge or reckless

13

As the district court noted, the difficulty with making a determination on whether MSC recklessly failed to investigate the Hendersons' claim before denying their claim is that there are factual questions regarding exactly *when* the denial of coverage occurred. A jury could conclude that any one of the three letters sent to the Hendersons served as a denial. Thus, for purposes of summary judgment, if there is an issue of material fact about whether MSC properly investigated the Hendersons' claim before *any one* of the letters was sent, then a summary judgment ruling dismissing the "abnormal" bad faith claim is erroneous. We find that, reviewing the evidence in the light most favorable to the Hendersons, that there are indeed issues of material fact regarding whether MSC

---

disregard of the fact that it had no legitimate or reasonable basis for denying a claim may be inferred and imputed to an insurer when it has shown a reckless indifference to facts or proof submitted by the insured.
*Grissett*, 732 So.2d at 976 (citations omitted).

     In 1999, the Alabama Supreme Court again moved away from its holding in *Weaver* in deciding *Slade*. In *Slade*, the insurance company investigated how an insured's home was damaged. The company discovered evidence that it was damaged due to earth movement, which would have precluded coverage. Despite the fact that the insurer relied upon evidence providing an arguable basis for denying the claim, the Alabama Supreme Court held that the insurer committed bad faith. *See Slade*, 747 So.2d at 315-16. The Court held that the insurer failed to investigate the possibility that lightning hit the home, which, if true, would have meant the company would have had to cover the claim. *See id.*

     We choose to follow the rationale of *Grisset* and *Slade* rather than *Weaver*, because *Grisset* and *Slade* are the more recent cases and therefore indicate that the Alabama Supreme Court has moved away from its reasoning in *Weaver*.

properly investigated the claim before issuing two of the letters.[3]  We review each

letter in turn.

(a) The September 2000 Letter

Like the district court, we assume that Chris Wilkes' September 28, 2000

letter functions as MSC's denial of coverage.[4]  In this letter, Wilkes denied the

Hendersons' claim on the grounds that the Neighbors' lawsuit was filed in January

---

[3] The district court stated that "no matter which missive is considered to be 'the denial letter,' the court finds no evidence in this case of the intent to injure, dishonest purpose, self interest, or ill will required to sustain even an abnormal bad faith claim."  Indeed, the Alabama Supreme Court has stated that "proof of mere negligence or mistake is not sufficient to support a claim of bad faith; there must be a refusal to pay, coupled with a conscious intent to injure." *Davis v. Cotton States Mut. Ins. Co.*, 604 So.2d 354, 359 (Ala. 1992); *see also Webb v. Int'l Indem. Co.*, 599 So.2d 1144, 1146 (Ala. 1992).

However, if we were to rely on the *Davis* Court's requirement of a "conscious intent to injure" in "abnormal" bad faith claims, we would ignore a slew of precedent, including cases coming after *Davis*, holding that an "abnormal" bad faith claim can be submitted to the jury if "the insurer either intentionally or *recklessly* failed to properly investigate the claim." *Thomas v. Principal Fin. Group* , 566 So.2d 735, 744 (Ala. 1990) (emphasis added); *see also Grissett*, 732 So.2d at 976; *Blackburn*, 667 So.2d at 668.  One who acts "recklessly" does not act with a "conscious intent to injure."  Rather, one who acts "recklessly" is one who acts in such a way that he may foresee the consequences of his conduct and not desire them to occur, but nonetheless persists with his conduct disregarding the risk of bringing about the unintended consequences of his conduct.  BLACK'S LAW DICTIONARY 1276 (7th ed. 1999) (citing J.W. CECIL TURNER, KENNY'S OUTLINES OF CRIMINAL LAW 28 (16th ed. 1952)).  Thus, in many of its recent "abnormal" bad faith cases, the Alabama Supreme Court does not impose a separate requirement of evidence of an intent to injure.  *See generally, Simmons*, 791 So.2d 371; *Slade*, 747 So.2d 293; *Grissett*, 732 So.2d 968; *Blackburn*, 667 So.2d 661.  The district court erred by requiring proof that MSC intended to injure the Hendersons with their investigation in a claim that only requires a "reckless" failure to investigate.

[4] MSC argues that Wilkes, and the Pinckard agency in general, lacked authority to act on behalf of MSC.  However, as the district court found, there are issues of material fact regarding whether Pinckard was a subagent of MSC.  Reviewing the evidence in a light most favorable of the Hendersons, therefore, we assume for purposes of summary judgment that Chris Wilkes and the Pinckard Agency had authority to act on behalf of MSC.

15

1999, and thus, was outside of the policy period.  Wilkes admittedly undertook no investigation of the claim other than comparing the effective date of coverage (May 15, 2000) with the date the original anticipatory nuisance suit was filed (January 15, 1999).[5]

The deficiency in Wilkes' investigation becomes apparent when we consider the evidence Wilkes based his decision upon.  Wilkes was given two complaints – the original nuisance complaint that was filed on January 15, 1999, and the amended complaint that was filed on June 20, 2000.  The copy of the amended complaint that Wilkes examined, however, did not have a date on it.

---

[5] The district court implied that Wilkes also investigated the claim by speaking to Mr. Henderson about the suit.  While Wilkes spoke to Mr. Henderson on the phone, the record shows that he only spoke to Mr. Henderson about his need for a written denial, not about the underlying facts of the claim.  The following is an exerpt from Wilkes's deposition testimony regarding his phone conversation with Mr. Henderson:

> A:  I do remember the phone call – just remember him asking me to write him a letter.
> Q:  And just tell me everything . . . you can recall about that conversation.
> A:  That's pretty much it . . .

Later, in Wilkes deposition testimony, he admits that all he did to investigate the claim was compare the date of the original complaint with the Hendersons' policy period:

> Q:  What did you do to [determine the Hendersons' were not covered]?
> A:  I guess I looked at the date of the lawsuit and looked at the policy period.
> Q:  Anything else?
> A:  Uh-uh. (Negative response)

Thus, the only investigation Wilkes conducted was comparing the dates of the policy with the date of the original complaint.  He admittedly did not call Mr. Henderson to investigate the merits of the claim.

16

Thus, it was unclear to Wilkes whether the damages alleged in the amended complaint occurred before or after May 15, 2000, the effective date of coverage of the Hendersons' policy. Yet, despite this uncertainty, Wilkes conducted no further investigation. He did not call Mr. Henderson to ask him when the events alleged in the amended complaint occurred. He did not call the clerk of court to inquire when the amended complaint was filed. He did nothing but rely upon the date on the original complaint. Such an investigation is hardly one in which he fulfilled his duty to "marshal all of the pertinent facts with regard to [the] insured's claim" before denying coverage. *Sockwell*, 829 So.2d at 130. While Wilkes may not have intended to injure Mr. Henderson with this deficient investigation, he arguably investigated in a reckless manner by failing to adequately investigate the facts and submit those facts to a thorough review. *See Blackburn*, 667 So.2d at 668.

Reviewing the facts in a light most favorable to the Hendersons, MSC was not entitled to summary judgment on the "abnormal" bad faith claim because there are issues of material fact whether Wilkes' conducted an adequate investigation before denying the Hendersons' claim in September 2000.

      (b) The February 2001 Letter

We next consider Atwood's letter of February 8, 2001, as MSC's denial of coverage. That letter, addressed to Greg Wilkes of the Pinckard Agency, (1) states that MSC has not received formal notice of the claim, (2) refers Greg Wilkes to the pollution exclusion found in the Hendersons' policy, and (3) requests a written explanation as to how the misstatement about prior litigation in the application came about.

Viewing the evidence in a light most favorable to the Hendersons, there again are issues of material fact regarding whether this letter was a result of an adequate investigation and whether Atwood fulfilled his duty to "marshal all of the pertinent facts with regard to [the Hendersons'] claim." *Sockwell*, 829 So.2d at 130. First, Atwood's reliance upon the complaint alone is not sufficient to conclude that the Hendersons' claim was not covered by MSC's policy because of the pollution exclusion. The complaint, on its face, refers to "rodents" and "vermin" causing damage, which clearly does not fall under the pollution exclusion clause that describes "acids" and "chemicals." Second, the record is clear that, prior to sending his letter, Atwood did not contact the Hendersons to inquire about their claim, the facts pertinent to the application of the pollution exclusion, or even the false information on the application. We find, therefore, genuine issues of material fact as to whether Atwood properly investigated the

18

claim or subjected the results of his investigation to a cognitive evaluation and review before sending his letter. *See Simmons*, 791 So.2d at 379.

(c) April 2001 Letter

We finally consider Mimi Anderson's April 19, 2001 letter to the Hendersons' attorney. In Anderson's letter, MSC abandoned the two reasons given by Atwood for denying coverage.[6] Rather, Anderson based the denial of coverage on (1) the "known loss" rule, (2) the fact that the claims asserted by the Hendersons' Neighbors did not qualify as an "occurrence" under the policy, and (3) the misstatement about involvement in prior litigation in the application. With regard to this letter, we agree with the district court that MSC properly investigated the Hendersons' claim before denying coverage.

Prior to writing her letter, Anderson submitted the Hendersons' claim to outside counsel for further investigation and review. She also reviewed all of the previously discussed information and correspondence. In particular, with regard to MSC's denial based on the misstatement about prior litigation in the application, Anderson conducted a proper investigation. Anderson, unlike Atwood, was able to consider the Hendersons' version of the facts regarding the

_____

[6] Anderson wrote, "MSC does not rely on the pollution exclusion as a basis for its conclusion that Mr. and Mrs. Henderson are not provided a defense . . . nor does it rely on the lack of any formal notice of the claim."

19

misstatement in the application. The Hendersons' version of the facts regarding the misstatement was in their lawyer's letter of February 22, 2001, which Anderson was able to review. Anderson was under no further obligation to interview the Hendersons to again receive their version of the facts. We agree with the district court with regard to the April 2001 letter, and conclude that there is not an issue of material fact as to whether Anderson recklessly investigated the Hendersons' claim.[7]

(d) Conclusion Regarding "Abnormal" Bad Faith Claim

In summary, we agree with the district court that there are questions of fact regarding which letter effectively denied coverage. If the factfinder finds that the September 2000 letter from Chris Wilkes denied the Hendersons coverage, then there is an issue of material fact regarding whether MSC committed "abnormal" bad faith. Likewise, if the factfinder finds that the February 2001 letter from Steve Atwood denied the Hendersons coverage, then there is also an issue of material fact regarding whether MSC committed "abnormal" bad faith. However, if the factfinder finds that the April 2001 letter from Mimi Anderson denied the

---

[7] Because one of the independent grounds on which Anderson denied the Hendersons' claim was properly investigated, we need not address whether the other two bases that Anderson gave were properly investigated. Even if we were to find that MSC may have recklessly investigated the Hendersons' claim with regard to the "known loss rule" defense and the no "occurrence" defense, we still would be compelled to find that Anderson's denial was not in bad faith because she properly investigated the misstatement in the application.

20

Hendersons coverage, and not the September 2000 letter or the February 2001 letter, then we agree with the district court that there is no issue of material fact regarding whether MSC is liable for "abnormal" bad faith.

III. Judgment as a Matter of Law

Finally, the Hendersons argue that the district court erred in denying their motion for judgment as a matter of law on their breach of contract claim at trial. However, if there was error, it was certainly harmless because the jury found in the Hendersons' favor on their breach of contract claim. *See* FED. R. CIV. P. 61. Thus, we affirm the district court's denial of the Hendersons' motion for judgment as a matter of law with regard to the breach of contract claim.[8]

CONCLUSION

---

[8] The Hendersons challenge the district court's denial of their motion for judgment as a matter of law on the contract claim, despite ultimately winning a jury verdict on that claim, because they believe they must do so to present a "normal" bad faith claim. They correctly point out that a "directed verdict on the contract claim" test must be met in order to submit a "normal" bad faith claim to the jury. *See Balmer*, 891 F.2d at 876 (applying Alabama law). However, they need not challenge the actual ruling of the district court on the contract claim. The Alabama Supreme Court made this clear by stating,

> This "directed verdict on the contract claim" test is not to be read as requiring, in every case and under all circumstances, that the tort claim be barred unless the trial court has literally granted plaintiff's motion for a directed verdict on the contract. Indeed the words "*entitled* to a directed verdict" so indicate.

*Safeco Ins. Co. of Am. v. Sims*, 435 So.2d 1219, 1224 (Ala. 1983). Thus, the Hendersons need not challenge the district court's actual ruling on their motion for judgment as a matter of law in order to present a "normal" bad faith claim.

21

While the district court did not err with respect to the Hendersons' "normal" bad faith claim, we find that the court erred in dismissing the Henderson's "abnormal" bad faith claim. Furthermore, we find that because the Hendersons eventually won a jury verdict on their breach of contract claim, there is no need to disturb the district court's denial of the Hendersons' motion for judgment as a matter of law on their contract claim. Thus, we REVERSE the district court's summary judgment ruling on bad faith and REMAND for further proceedings consistent with this opinion. We also AFFIRM the district court's denial of the Hendersons' motion for judgment as a matter of law on their breach of contract claim.

**AFFIRMED in part, and REVERSED and REMANDED in part.**